Richmond

## MAJOR HENRY JOHNSON, JR.

v.

## COMMONWEALTH OF VIRGINIA

June 8, 1979.

Record No. 781678.

Present: All the Justices.

Clifford R. Weckstein (Barry N. Lichtenstein; Lichtenstein & Weckstein, on briefs), for appellant.

Jim L. Chin, Assistant Attorney General (Marshall Coleman, Attorney General, on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

In this criminal appeal, we review the capital murder conviction of Major Henry Johnson, Jr.

On July 26, 1978, Johnson, then 26 years of age, was convicted of wilful, deliberate and premeditated murder during the commission of robbery while armed with a deadly weapon. Code § 18.2-31(d). He was also convicted of using a firearm during the commission of a felony and sentenced to one year imprisonment in the penitentiary. Code § 18.2-53.1. Pursuant to the statutory scheme set forth in Code §§ 19.2-264.3 and -264.4, the jury reconvened and, after hearing evidence on July 27, 1978, on Johnson's prior criminal record and upon other matters relevant to sentencing, recommended imposition of the death penalty. The jury's recommendation was accepted by the trial court and the death penalty was imposed at the sentencing hearing held on August 21, 1978. Code § 19.2-264.5.

The murder victim, John Gardner, president of a real estate company located in Roanoke, rented an apartment to the defendant. Living with defendant was his younger brother, David Allen Johnson. On December 9, 1977, the brothers went to Gardner's office ostensibly to pay overdue rent, but with the joint purpose of robbing Gardner. During the commission of the robbery, Gardner was fatally wounded. The medical evidence adduced at trial indicated that the victim died as a result of three gunshot wounds found on the back of his head and neck. Any one of the wounds would have caused instantaneous loss of consciousness, and death would have resulted in "a matter of minutes." Apparently, just one weapon was used in the murder and robbery. Only the perpetrators of the crime witnessed its commission.

Defendant and his brother were arrested separately on December 12, 1977. The brother first confessed on December 13, 1977, at 1:25 a.m. In that account, the brother stated that he fired the three shots which killed Gardner. The brother next talked to the police at 1:10 p.m. on December 13, at which time he stated that the defendant fired all of the shots. The defendant talked to police briefly on December 12 at 11:11 p.m. but "said very few words". On December 13 at 2:18 p.m., the defendant confessed to police that he fired the three fatal shots.

At trial, the defendant testified that his brother fired the shots. The defendant asserted that his confession was not true and that he made the statement assuming responsibility for the crime because his brother had a "clean record". The brother, testifying at trial, maintained that the defendant fired the fatal shots and explained his first confession, which admitted commission of the murder, by stating that he believed the defendant had terminal cancer and that he made the statement to "protect" defendant. The brothers' testimony at trial conflicted on almost every aspect of the commission of the crime.

Initially, defendant asserts that the trial court misapplied the law dealing with principals in the first and second degree as that subject relates to capital murder and, consequently, misdirected the jury and authorized improper closing argument by the prosecutors.

When, as here, the offense constituting the charge of capital murder is the wilful, deliberate and premeditated killing of a person in the commission of robbery while armed with a deadly weapon, Code § 18.2-31 (d), only the actual perpetrator of the crime may be convicted of capital murder. Code § 18.2-18. That section provides:

§ **18.2-18. How principals in second degree and accessories before the fact punished.** — In the case of every felony, every principal in the second degree and every accessory before the fact may be indicted, tried, convicted and punished in all respects as if a principal in the first degree; provided, however, that except in the case of a killing for hire under the provisions of § 18.2-31(b) an accessory before the fact or principal in the second degree to a capital murder shall be indicted, tried, convicted and punished as though the offense were murder in the first degree.

The proviso in this statute was added by the General Assembly in 1977. Acts 1977, ch. 478. Prior to this amendment, in the case of every felony in Virginia a principal in the second degree could be indicted, tried, convicted and punished as if a principal in the first degree. As the result of the amendment, however, it is now

essential in a prosecution for capital murder, except in the case of murder for hire, that the heretofore unnecessary distinction be drawn between principals in the first and second degree, assuring that only the person who is the immediate perpetrator may be a principal in the first degree and thus liable to conviction for capital murder. Indeed, the Attorney General does not dispute that proposition, stating on brief, that: "It is the position of the Commonwealth that the defendant cannot be convicted of capital murder by [evidence which shows that the defendant merely planned] the robbery and that a death ensued during the commission of the robbery, regardless of who committed the killing."

The correctness of the foregoing rule is made plain when the exception contained in the proviso is considered. Excluded from the operation of the proviso is the case of a killing for hire constituting capital murder under subsection (b) of Code § 18.2-31.* Manifestly, the General Assembly realized that, without the exception, a person who conceived and instigated a murder for hire, and who procured the agent who actually committed the homicide, could not be convicted of capital murder unless he directly participated in the act causing the victim's death. To endorse the theory (adopted, as we shall see, by the trial court and prosecutor below) that a capital conviction may result from a common plan and that the accused may be a principal in the first degree even though he did not perform the homicidal act, would render meaningless the exception contained in § 18.2-18 in most murder for hire situations. Thus, in order to convict this defendant of capital murder, the jury was required to find that he actually fired the fatal shot.

---

*§ 18.2-31. Capital murder defined; punishment. — The following offenses shall constitute capital murder, punishable as a Class 1 felony:

(a) The willful, deliberate and premeditated killing of any person in the commission of abduction, as defined in § 18.2-48, when such abduction was committed with the intent to extort money, or a pecuniary benefit;

(b) The willful, deliberate and premeditated killing of any person by another for hire;

(c) The willful, deliberate and premeditated killing of any person by an inmate in a penal institution as defined in § 53-19.18, or while in the custody of an employee thereof;

(d) The willful, deliberate and premeditated killing of any person in the commission of robbery while armed with a deadly weapon;

(e) The willful, deliberate and premeditated killing of a person during the commission of, or subsequent to, rape; and

(f) The willful, deliberate and premeditated killing of a law-enforcement officer as defined in § 9-108 when such killing is for the purpose of interfering with the performance of his official duties.

■ Against the background of the conflicting testimony of the brothers, the absence of other probative evidence as to the identity of the actual triggerman, and the limitation imposed by Code § 18.2-18, at least four instructions on the subject of principals were given and two were refused by the court below. Instruction 4, which was given, stated:

> The Court instructs the jury that if you believe from the evidence beyond a reasonable doubt that David Johnson and the defendant had agreed, planned or designed to rob or commit larceny from John Gardner, and that while engaged in carrying out such plan David Johnson and Major Johnson were present, aiding, abetting and sharing the intention of the other, and that while so engaged Major Johnson or David Johnson shot and killed John Gardner, and that such a shooting should have been contemplated as a probable result of the execution of such common design, then even though you are unable to determine which of them fired the fatal shot, each is equally guilty of whatever degree of homicide, if any, the jury finds to have been committed under the evidence and other instruction of the Court.

The defendant objected to Instruction 4 and proffered Instructions A and B instead: Instruction A provided:

> The Court instructs the jury that in order to find the defendant guilty of capital murder, you must find beyond a reasonable doubt that the defendant actually fired the shot or shots that killed John Gardner.

Instruction B was almost identical to Instruction 4 and provided:

> The Court instructs the jury that if you believe from the evidence beyond a reasonable doubt that David Johnson and the defendant had agreed, planned or designed to rob or commit larceny from John Gardner, and that while engaged in carrying out such plan David Johnson and the defendant were present, aiding, abetting and sharing the intention of the other, and that while so engaged one of them shot and killed John Gardner, and that such a

shooting should have been contemplated as a probable result of the execution of such common design, then even though you are unable to determine which of them fired the fatal shot, each is equally guilty of whatever degree of homicide, if any, the jury finds to have been committed under the evidence and other instructions of the Court. *The Court further instructs you, however, that if you are not able to determine beyond a reasonable doubt which person fired the fatal shot, then you cannot convict the defendant of capital murder, as defined in the other instructions of this Court.*

(Emphasis indicates material differences between refused Instruction B and granted Instruction 4.)

The trial judge also gave Instruction 5 which informed the jury that they could find the defendant guilty of capital murder if they believed beyond a reasonable doubt "that the defendant wilfully, deliberately and premeditatedly killed John Gardner, and at the time of any such killing the defendant was committing robbery while armed with a deadly weapon. . . ." Instruction 6, given by the trial judge, provided:

The Court instructs the jury that principals in the first degree are those who are the actual or immediate perpetrators of the crime. Principals in the second degree are those who did not with their own hands commit the act which constituted the crime, but who were present, aiding and abetting in its commission. The test for a principal in the second degree is whether he was encouraging or inciting the commission of a crime by words, gestures, looks or signs, or in some manner offering aid or consent to its commission.

Principals in the second degree are liable to the same punishment as principals in the first degree, except that principals in the second degree cannot be convicted of capital murder.

Therefore, if you find from the evidence that the defendant is a principal in the second

degree to capital murder, you cannot find him guilty of capital murder.

Instruction 10, given by the trial court, informed the jury that if they believed

> beyond a reasonable doubt that [the defendant's brother] was guilty of the murder of John Gardner, and further believe from the evidence beyond a reasonable doubt that the defendant was present, aiding and abetting as a principal in the second degree in the commission of such crime, as defined in another instruction of the Court, then you shall find the defendant guilty of murder in the first degree.
>
> . . .

In his ruling refusing Instructions A and B, the trial judge stated that he believed "that if two persons acting in concert previously planned to commit Robbery and Murder, committed the robbery and murder, then each would be guilty as a principal in the first degree." Therefore, the court informed the attorneys that Instruction 4 was a correct statement of the law and that the theory advanced by the defendant in Instruction B would be refused.

As a result of this ruling and over defendant's objection, the prosecutors repeatedly asserted in their closing and rebuttal argument that the jury could find the defendant guilty of capital murder on two theories. First, it was argued that the defendant clearly pulled the trigger and was guilty of capital murder. Second, the contention was made that the jury could convict the defendant of capital murder "regardless of who pulled the trigger." The following excerpts are representative of the prosecutors' statements advancing the second theory:

> [I]f you find that David and Major Johnson planned to commit a robbery from John Gardner and together, that they went down to execute that plan, and in the course of the execution of that plan, John Gardner was killed while they were committing a robbery with a deadly weapon, that is Capital Murder regardless of who pulled the trigger.
>
> *   *   *
>
> Now, here is the most important thing in all of that. Whether you believe who pulled the trigger or whatever, he [the defendant] is gu-

ilty of Capital Murder. The reason he is guilty of Capital Murder is because he is a principal in the first degree. The reason he is a principal in the first degree is because he planned the robbery. He had his brother buy the pistol. All the plans are indicative of that, even from his statement, even from his statement on the stand, and even from the statement of David, which means that he is an integral part, not a bystander, not a principal in the second degree, but an active mover in the whole crime, with the crimes and the terrible death that Mr. Gardner suffered. So, therefore, he becomes a principal in the first degree, not . . . in the second. He is a prime mover. As a matter of fact, he planned it, he was there, and even if David Johnson did pull the trigger, which I indicate to you and I think the evidence has indicated, did not. This man pulled it, but even if David did, he is still guilty of Capital Murder because of the participation as a principal in the first degree.

While agreeing that refused Instructions A and B are correct statements of the law, the Attorney General maintains that the jury was charged adequately and correctly in Instructions 4, 5, 6 and 10. The Commonwealth asserts that the substantive provisions of Instruction A were covered in Instructions 5 and 6 and that the substantive provisions of Instruction B were covered in Instructions 4 and 6. The Commonwealth concludes that Instructions A and B were refused properly to avoid multiplicity.

With respect to the prosecutors' closing argument, the Attorney General concedes that the comments were erroneous but urges that the prosecutors' statements were not so prejudicial "as to deny the defendant a fair trial." Noting that in parts of their argument the prosecutors correctly stated the law applicable to capital murder, the Commonwealth contends that the argument contained "only a partial misstatement of the law" and that "not every misstatement of law in argument by the prosecution is reversible error if the argument taken as a whole was substantially correct in principle and supported by law and evidence." We reject the Attorney General's contentions both as to the instructions and the closing argument.

In order that instructions may inform the jury fully and fairly

upon the law of the case applicable to the particular facts, they should not be drafted so as to confuse the jury. *H. W. Miller Trucking Co.* v. *Flood,* 203 Va. 934, 936, 128 S.E.2d 437, 439 (1962). And, where appropriate, instructions should be qualified by a cross-reference to another in "a manner which will clearly convey to the jury the force and effect of the qualification." *Outlaw* v. *Pearce,* 176 Va. 458, 469-70, 11 S.E.2d 600, 605 (1940).

In the present case, Instructions 4, 5, 6 and 10, read individually, are correct statements of the law. But unitary accuracy will not suffice under the circumstances of this case. Instruction 4, read in the abstract, informs the jury that "even though . . . [the jury is] unable to determine . . . [who] fired the fatal shot," the defendant is "guilty of whatever degree of homicide, if any, the jury finds to have been committed under the evidence and other instruction of the Court." This instruction is qualified only by a general reference to "other instruction", not by a specific cross-reference to Instruction 6, the crucial limiting instruction involved here. The trial court should have either inserted in Instruction 4 a specific reference to Instruction 6 or added to Instruction 4 language similar to the emphasized portion of Instruction B, *supra.*

When the inadequacy inherent in Instruction 4 is combined with the admittedly erroneous portions of the Commonwealth's argument, it is manifest that an incorrect and confusing analysis of the law was presented to the jury. Based on the prosecutors' argument the jury could have believed that it could convict the defendant of capital murder though it was unable to determine who fired the fatal shots or if it determined that the defendant's brother fired the fatal shots. Instructions 6 and 10 were contradicted by the erroneous argument advanced under Instruction 4 and approved by the trial judge. Thus, this combination of factors caused the case to be submitted to the jury on conflicting statements of the law and the jury was permitted to convict the defendant of capital murder without having to resolve a factual issue which was essential to a proper verdict. This was error.

Alternatively, the Attorney General argues, however, that the foregoing error was harmless. We think otherwise. As we have just said, the effect of the error was to permit a conviction of the accused of capital murder without requiring the jury to determine that defendant fired the fatal shot. Under the instructions, read singly without adequate qualification, and under the argument, the jury did not have to determine the identity of the triggerman. Because such a determination was crucial to a valid finding of capital murder, we conclude that the erroneous interpretation of

the law conveyed in the form of the instructions and advanced by the closing argument constituted harmful, reversible error.

*State* v. *Harris*, 290 N.C. 681, 695-96, 228 S.E.2d 437, 445 (1976), relied upon by the Commonwealth, is inapposite. There, the prosecution in closing argument used imprecise language in defining the felony-murder rule for the jury. The evidence in *Harris* clearly supported the verdict reached and since the jury had been properly instructed, the North Carolina Supreme Court found that the "misstatements of law" involved were not material or prejudicial. As noted previously, the evidence before us is sharply conflicting. Because of the improper argument interpreting the instructions, we cannot determine how the jury resolved these conflicts, if they did. The misstatements of the law involved here went to the core of this case and cannot be dismissed as mere innocuous comments.

█ Because the case will be remanded for a new trial, we need address only one other assignment of error. Many of the issues raised by defendant have now been adjudicated by us in *Smith* v. *Commonwealth*, 219 Va. 455, 476-79, 248 S.E.2d 135, 148-49 (1978), *cert. denied*, 441 U.S. 967 (1979), a decision announced after final judgment was entered in this case. We thus turn to defendant's contention that the trial court erred in failing to suppress his confession.

As noted previously, the defendant was arrested on December 12. At his 9:00 a.m. arraignment on December 13, pleading indigency, he asked the general district court to appoint counsel for him. The request was granted and the defendant was returned to the Roanoke City Jail. At 2:18 p.m. on that same day, Detective James C. Clingenpeel of the Roanoke City Police Department initiated an interview with defendant at the jail. Clingenpeel advised the defendant of his rights, according to *Miranda* v. *Arizona*, 384 U.S. 436 (1966), using a "rights card" which provided, in part:

> 3. You have the right to talk to a lawyer right now and have him present during the entire time you are being questioned.

> 4. If you cannot afford to hire a lawyer, one will be furnished to represent you before any questioning.

5. If you desire to answer my questions without a lawyer, you may do so, but you may stop at any time you should desire.

The defendant indicated that he understood the statements and signed the card in the space provided. The defendant then orally gave an inculpatory statement which was not recorded and which was completed at 3:10 p.m. Clingenpeel, who testified at an April 1978 suppression hearing, stated that he immediately returned to his office and reduced his recollection of the defendant's confession to writing. The defendant did not thereafter examine or sign the officer's memorandum.

At the suppression hearing, Clingenpeel stated that, at the time of the interview, he did not know whether the defendant had been arraigned, or whether counsel had been appointed. He testified that he made no attempt to ascertain if counsel had been, in fact, appointed and, of course, did not try to notify counsel of the interview. The defendant was first informed of the identity of his court-appointed counsel on December 14 and first saw the attorney on that day. The record does not reveal when counsel learned of the appointment.

The defendant asserts that the trial court erred in refusing to suppress his confession because the police did not allow him sufficient time to confer with his court-appointed counsel before they initiated a custodial interview, *citing United States* v. *Clark*, 499 F.2d 802 (4th Cir. 1974). He maintains that our prior decisions in *Lamb* v. *Commonwealth*, 217 Va. 307, 227 S.E.2d 737 (1976), and in *Skinner* v. *Commonwealth*, 212 Va. 260, 183 S.E.2d 725 (1971), are not controlling. He urges that, unlike the defendant in *Lamb*, he did not surrender voluntarily on the advice of counsel and unlike the defendants in *Lamb* and *Skinner* he did not initiate the interview after having had the opportunity to confer with his attorney. We disagree with defendant's argument.

We have adopted the rule that "the police may question an accused who has counsel, retained or appointed, whether or not the attorney is present, if there is an affirmative waiver by the accused of his right to counsel made voluntarily, knowingly and intelligently." *Lamb* v. *Commonwealth*, 217 Va. at 310, 227 S.E.2d at 740. Such a waiver may occur either before or after counsel is retained or appointed. *See Skinner* v. *Commonwealth*, 212 Va. at 263, 183 S.E.2d at 728. And a defendant may waive his right to counsel after he has previously asserted the right, as long as the defendant's prerogative to exercise the right is "scrupulously

honored", *Michigan* v. *Mosley,* 423 U.S. 96 (1975); *Miranda* v. *Arizona,* 384 U.S. at 474-75; *State* v. *Steelman,* 585 P.2d 1213, 1221-22 (Ariz. 1978); *State* v. *Stone,* 397 A.2d 989, 995 (Me. 1979), although the courts indulge every reasonable presumption against waiver and a heavy burden rests on the Commonwealth to demonstrate that the defendant knowingly, intelligently and voluntarily waived his right to counsel. *Brewer* v. *Williams,* 430 U.S. 387, 404 (1977); *Lamb* v. *Commonwealth,* 217 Va. at 310-11, 227 S.E.2d at 740.

We believe *Lamb* and *Skinner* control here. We will even assume, but not decide, that defendant is correct in that part of his argument in which he maintains that a request for the appointment of an attorney at arraignment constitutes an exercise of the right to counsel requiring the cessation of police interrogation under *Miranda.* Nevertheless, we think that the defendant here subsequently knowingly, intelligently and voluntarily waived his right to counsel.

The defendant was initially interviewed on the day of his arrest, the day before his arraignment. While the testimony indicates that he "said very few words", the record shows that defendant was advised of his rights on that day and affirmatively waived his right to counsel and his right to remain silent during that interview. On the next day, five hours after his arraignment, when the police sought to interview defendant, the interviewing officer, without knowing whether defendant had been arraigned, informed him of his rights orally and in writing at the commencement of the interrogation. The defendant then affirmatively waived his right to counsel by signing the "rights card" beside the statement "SIGN IF YOU WAIVE THESE RIGHTS". He then willingly discussed the case without ever asking to see counsel at any time during the course of the interview.

*United States* v. *Clark,* 499 F.2d 802 (4th Cir. 1974), relied upon by the defendant, is distinguishable. There, the defendant's request for appointed counsel on grounds of indigency was denied at the bond hearing. After the hearing, government agents attempted to interview the defendant, but he stated that he wanted to consult with an attorney. The interview was terminated; however, three-and-one-half hours later, the agents again initiated interrogation of the defendant and attempted to *persuade* him to answer questions. Clark ultimately waived his right to counsel orally and gave an inculpatory statement. In holding that the waiver was involuntary, the Court of Appeals emphasized the fact that the defendant had previously requested counsel, that the police initiated the second

interrogation and that the police used persuasion to convince the defendant to waive his right to counsel. *Id.* at 807.

In *Clark,* the defendant's assertion of his right to counsel occurred in an interrogation context after defendant's request for appointed counsel had been refused. Here, the defendant never asserted his right to counsel during interrogation. The record does not reveal any attempt to persuade the defendant to waive his right to counsel; rather, the defendant signed the waiver card when he was first asked. And while in *Clark,* as here, the police initiated the interrogation, there is no evidence that the police conduct was coercive in this case. Thus, we think the trial court was correct in admitting the confession in evidence.

For the error in the form of the instructions as compounded by the improper closing argument of the prosecutors, we will reverse the judgment convicting defendant both of capital murder and of use of a firearm during the commission of a felony.

The Attorney General at the bar suggested that, in the event of a reversal, the remand should be for the sole purpose of sentencing defendant for first degree murder because, under the jury's finding, defendant is guilty of either capital murder or murder in the first degree. But the error of which we have spoken has not affected only those two grades of the homicide and the quantum of punishment; it has permeated the entire guilt and punishment determination at all stages. So, under these circumstances, we may not properly select one grade of the homicide to furnish the basis for resentencing only.

Consequently, for all of these reasons, the charges of capital murder and of using a firearm during the commission of a felony will be remanded for a new trial on all issues.

*Reversed and remanded.*