# Richmond

## JAMES T. CLARK, JR.

### V.

## COMMONWEALTH OF VIRGINIA

August 30, 1979.

Record No. 790092.

Present: All the Justices.

*Robert T. Hall* (*Richard J. Colten; Hall, Surovell, Jackson & Colten, P. C.,* on brief), for appellant.

*Vera S. Warthen, Assistant Attorney General* (*Marshall Coleman, Attorney General,* on brief), for appellee.

HARRISON, J., delivered the opinion of the Court.

On August 29, 1978, a jury convicted James T. Clark, Jr., of willful, deliberate and premeditated murder for hire, Code § 18.2-31(b), and, after a penalty proceeding, recommended that his punishment be death. Code §§ 19.2-264.3, -264.4. On November 21, 1978, a sentencing hearing was held during which the trial court considered a post sentence report, the testimony of the defendant and the defendants'

parents, as well as argument of counsel. Code § 19.2-264.5. At the conclusion of this proceeding, the court confirmed the jury's verdict and ordered that Clark be executed. The defendant sought and is entitled to this appellate review as a matter of right.

The evidence at trial established that George Harold Scarborough was found dead in his Springfield, Virginia townhouse around 10:00 p.m. on January 31, 1978. The body was lying on the floor, just inside the front door. An autopsy revealed that the victim had died as a result of five gunshots to the head and chest. A police investigation disclosed that the townhouse had been ransacked. A bottle of chloroform and a knife were found near the body, which was lying on a green toss pillow.

Approximately five months after the slaying, defendant Clark was arrested in Los Angeles, California. Investigators Guy C. Boggess and Larry Oliff of the Fairfax County (Virginia) Police Department questioned Clark concerning the Scarborough murder. After being informed of his constitutional rights, defendant executed a waiver and made a statement confessing to the murder. A few hours after this initial confession the Virginia officers, after again advising Clark of his constitutional rights, elicited and recorded a second statement, which was transcribed and subsequently read, corrected, and signed by Clark. It was this detailed account that the Commonwealth relied upon at trial to link the defendant with the murder.

In his statement Clark said that he was visiting his second cousin, Charles Daniel Stewart, one night in January 1978, when Stewart got a call from a friend, Mrs. Betty M. Holler, who offered Stewart $7,000 to commit a murder. Stewart, in turn, asked Clark if he would kill someone for $3,500 and when Clark consented, the deal was settled. Subsequently the men met with Holler, who gave them Scarborough's name, address, phone number, description, and a bottle of chloroform "[t]o put the victim out." A trip was also made to the victim's place of work so that Holler could point him out to Clark and Stewart. Clark stated that Holler was acting for Scarborough's wife, Jamie, in arranging the murder.

Clark said that he and Stewart were paid $1,200 before the murder with the understanding that $5,800 would follow after Scarborough was killed. On a tip from Holler that Scarborough was returning home from a trip, the men, on January 31, 1978, broke into the victim's townhouse by jimmying the glass patio door. They ransacked the home, attempting to simulate a burglary. Waiting for Scarborough, they planned their attack as they drank and ate from the victim's refrigerator. When Scarborough arrived, Stewart, who was armed

with a knife, grabbed him from behind and tried to chloroform him. When Scarborough broke free, Clark, who had a gun, ordered him to stop resisting. The victim continued to struggle, and Clark "shot him at pointblank," using a green toss pillow to muffle the noise.

With Scarborough dead, Clark stated that he removed $435 from the back pocket of the deceased and that he and Stewart left, taking with them the money, a few other items of personal property, and some steaks from the victim's refrigerator. They went home and joined their girl friends, played records, ate the steaks, drank alcohol, and called Holler to report to her "[t]he beast is deceased."

At the conclusion of the Commonwealth's evidence, the defense called no witnesses. The jury subsequently returned a guilty verdict. In the evidence entered as to sentencing, the Commonwealth showed that Clark had previously been convicted in Maryland for conspiracy to distribute controlled drugs, and he had been sentenced to serve three years in the penitentiary. Additionally, Investigator Boggess stated that in the course of his general conversations with Clark, the defendant never indicated that he was sorry for what happened. In fact, Boggess stated that Clark said he was not sorry for what happened, only sorry that he was caught.

We consider the defendant's assignments of error questioning his conviction and the sentence imposed on him.

## EXCLUSION OF JUROR

■ The defendant argues that the trial court erred in excluding Ms. Ellen Ellis as a juror because of her predisposition against capital punishment. Ellis was examined at length by counsel and by the court. Her testimony establishes that her views on the imposition of the death penalty were such as to inhibit her from considering such a penalty.

At the outset of her examination by the court, she stated flatly, "I am against capital punishment." When asked if she could impartially consider death as a possible penalty in a capital case, she responded: "I can't state that I could be impartial. I feel that I might be ultimately reluctant to impose a guilty sentence if it required the death penalty, yes." When asked if her views would prevent her from considering the death penalty when the only punishment she could give would be life imprisonment or death, she responded, "I think it could inhibit me, yes." Upon further questioning she responded with such answers as "but I do have a conviction that the death penalty is—it is not the best punishment in such a case"; "I don't think I could con-

vict"; "I don't think I could vote for conviction if he would have to be [executed]." In a final exchange she was asked whether, after finding a defendant guilty, she could consider imposition of a death sentence where her only choices were death and life imprisonment. Ms. Ellis responded, "I have a very real fear that I couldn't sentence someone to death."

A juror may not constitutionally be excluded for cause merely because he or she may have voiced a general objection to the death penalty or expressed conscientious or religious scruples against its imposition. *Witherspoon* v. *Illinois,* 391 U.S. 510 (1968). We said in *Smith* v. *Commonwealth,* 219 Va. 455, 248 S.E.2d 135 (1978), *cert. denied,* 442 U.S. 932 (1979), and *Lewis* v. *Commonwealth,* 218 Va. 31, 235 S.E.2d 320 (1977), that a prerequisite for such juror exclusion is an irrevocable commitment to vote against the death penalty. In the instant case testimony given by Ellis revealed that she would automatically vote against such penalty. Her responses were sufficient to communicate an unmistakably clear commitment against the death penalty, and we hold that the trial court did not err in so finding.

## THE DEFENDANT'S CONFESSION

■ The defendant moved the court to suppress his confession, alleging that it was involuntary and was made under coercion and duress.

On June 21, 1978, Clark was interrogated at the Los Angeles City Jail by Investigators Boggess and Oliff. He was advised of his constitutional rights and signed an acknowledgment form. Clark then made a confession after inquiring as to the penalty for the crime with which he was charged and being correctly informed that the punishment was either death by electrocution or life imprisonment. The confession is 49 pages in length, and each page is initialed by the defendant who made 23 corrections before signing it. Specifically, Clark claims that he interpreted remarks made by Investigator Boggess to mean that if he cooperated and confessed, the court would not sentence him to death.[1] The defendant further says that his confession was coerced by

---

[1] In a hearing on a pre-trial motion to suppress his confession, the following testimony was given by Clark:

Q. All right. At that point in time in the room, somebody start [sic] to explain to you your rights?

A. Right off I was asked about my interminable [sic] rights, Which I was read back at the motel in Hollywood.

Boggess because he claims the officer told him that the Commonwealth's Attorney was considering charging Clark's girl friend with being an accessory. Clark said he understood that if he cooperated with the officers, no charges would be brought against his girl friend.

Boggess testified emphatically that he made no promises whatsoever to the defendant and did not threaten or coerce him in any way. The officer denied that he told the defendant that it would be better for him if he confessed. Responding to Clark's allegation regarding the defendant's girl friend, Boggess testified that he told the defendant that the Commonwealth's Attorney might charge the defendant's friends who accompanied him from Virginia to California. Clark admitted that Boggess said that only the Commonwealth's Attorney would decide whether to charge his girl friend.

Aside from the fact that the evidence would not support a finding that Clark's confession was made to aid his girl friend, the rule is that "a confession is not *per se* invalid merely because the confessor implicates himself in an effort to secure the best possible disposition of a charge pending against a relative or friend." *Ferguson* v. *Boyd*, 566 F.2d 873, 878, n.7 (4th Cir. 1977). The confession in this case was admittedly given after the defendant had twice been given his *Miranda* warnings. He admits that he knew his rights and knew that the statements he made could be used against him. The confession is clear, coherent, and unambiguous. Relying upon the testimony of the de-

Q. All right. Let me show you this. Do you remember this document being shown to you?

A. Yes, I do.

Q. All right. And whose signature is that on there?

A. That's mine.

Q. All right. Is there any particular right in question that was gone over a number of times?

A. Yes, number two. [Anything I do or say can and will be used against me in a court of law.]

Q. What was said to you about number two? First of all, who said it to you?

A. Lieutenant Boggess.

Q. All right. And what did he say to you? What was his explanation at that point in time?

A. Well, he read the right off and asked me if I understood it, which I said yes. Back stepped and asked me if I understood that right again, and then he read it over several times and made variations in what it could mean one way or the other. Anything I do or say can and will be used against me. If I—And if I confessed, that it was more than likely it was found better for me in court that I confessed and that I would be more than likely able to, you know, the court would say that I was cooperative, which I was the whole time, and that they would be more prone to, due to my cooperation, to impose a life sentence other than, as he put it, in his words, "have my pretty hair shaved off there and sent to the electric chair".

fendant and the officers who took the confession, the trial court found that the statement was voluntarily and knowingly given, and that there was no police misconduct involved. These findings of the trial court are fully supported by credible evidence and should be viewed as conclusive. *Wooden* v. *Commonwealth,* 208 Va. 629, 159 S.E.2d 623 (1968).

## PROOF OF THE CORPUS DELICTI

■ The defendant alleges that the trial court erred in submitting the case to the jury on the issue of capital murder, contending that without his confession there was insufficient proof of the *corpus delicti.* We find no merit in this assignment.

The *corpus delicti* in homicide cases consists of two components: (1) the death of the party alleged to have been murdered, and (2) the fact that death resulted from the criminal act or agency of another person. It may be proved by circumstantial evidence. *Lane* v. *Commonwealth,* 219 Va. 509, 248 S.E.2d 781 (1978). In the instant case, the death of Scarborough and the manner in which he was killed are undisputed. The body was recovered and the autopsy disclosed that death was caused by five gunshot wounds to the head and chest. Testimony showed that it would have been physically impossible for the victim to have inflicted the gunshot wounds on himself, as one shot entered the left temple of his head and three the left back of his chest. Further, it is well settled that the *corpus delicti* need not be established by evidence independent of the confession, but may be established by both. *Reid* v. *Commonwealth,* 206 Va. 464, 144 S.E.2d 310 (1965).

## LESSER INCLUDED OFFENSES

■ The trial court correctly refused to grant any instructions that related to lesser included offenses. There is no evidence in the record that would justify a finding by a jury that the defendant was guilty of any charge other than capital murder. No evidence was offered by the defense in an effort to reduce the degree of the homicide, and no evidence introduced by the Commonwealth supports a reduction in the grade of the offense. The defendant was either guilty or innocent of capital murder. Yet defendant argues that since every murder in Virginia is presumed to be in the second degree, the court should automatically instruct juries on lesser included offenses "for good measure." We disagree. The defendant is not entitled to a lesser degree instruction solely because the case is one of murder. *Wooden* v. *Commonwealth, supra.*

## DEFENDANT'S PRIOR CRIMINAL RECORD

■ At the sentencing phase of defendant's trial, the jury was advised that in August 1976, the defendant had been convicted in Maryland of conspiracy to distribute controlled drugs, a felony, and had been sentenced to serve three years in the penitentiary. At the time this information was introduced no objection was made by the defendant. The objection he now makes was voiced for the first time on defendant's motion to reconsider sentence. Clearly Virginia Code § 19.2-264.2 requires a consideration of the history and background of the defendant and his prior record. *Smith* v. *Commonwealth, supra, Mason* v. *Commonwealth,* 219 Va. 1091, 254 S.E.2d 116 (1979). Additionally, the United States Supreme Court has held that the sentencer is required to consider the prior record of the defendant in death penalty cases. *See Woodson* v. *North Carolina,* 428 U.S. 280 (1976), *Proffitt* v. *Florida,* 428 U.S. 242 (1976). *See also Gregg* v. *Georgia,* 428 U.S. 153 (1976).

## DEFENDANT'S LACK OF REMORSE

■ Defendant assigns error to the action of the court in permitting Investigator Boggess to testify at the sentencing stage that Clark never expressed to him any remorse for the crime. During the course of a general conversation, held while Clark's confession was being transcribed, Boggess asked the defendant whether he had any remorse or sorrow concerning the murder. Boggess said that Clark replied, "He was sorry that he got caught." No *Miranda* violation is involved here. The defendant admits having received his *Miranda* warnings the previous day, and that he was thoroughly familiar with all his constitutional rights.

Further, the question of defendant's lack of remorse was a proper circumstance to be considered by the jury at the sentencing phase of the trial. The statute requires the Commonwealth to prove beyond a reasonable doubt that there is a probability, based upon evidence of the defendant's prior history or of the circumstances surrounding the commission of the offense of which he is accused, that he would again commit criminal acts of violence that would constitute a continuing serious threat to society. Code § 19.2-264.4(C). Testimony that a defendant who committed murder deliberately and for hire, referred to his victim as "a beast", and then expressed no regret or remorse for the act he committed, is obviously proper testimony for a jury to consider in determining whether such person would in all probability commit criminal acts of violence in the future. Had the defendant

manifested remorse, sorrow, or grief for the murder that he had committed, this would have been a circumstance in mitigation admissible in evidence at the sentencing phase.

## AGGRAVATING FACTORS PROVIDED IN VIRGINIA CODE § 19.2-264.4(C)[2]

■ The defense alleges error because the trial court failed, of its own motion, to define the following terms used in the instructions: "outrageously or wantonly vile", "horrible or inhuman", "depravity of mind or aggravated battery to the victim."

Although the trial court was of the opinion that the meanings of the terms used by the statute were a matter of common knowledge, it offered to consider any definitional instructions that counsel wanted to submit. None were submitted in acceptable form and none were granted.

In *Smith,* handed down subsequent to the trial in the instant case, we construed the words "depravity of mind" to mean "a degree of moral turpitude and psychical debasement surpassing that inherent in the definition of ordinary legal malice and premeditation," and the words "aggravated battery" to mean "a battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder." 219 Va. at 478, 248 S.E.2d at 149. This does not mean, however, that those definitions are the best or the only ones. We agree with the trial court that the terms used in the statute are commonly used and each has an accepted meaning. While the terms may have been defined in an instruction to the jury, in a manner satisfactory to this Court, the fact that the trial court did not choose to give such a definitional instruction does not constitute reversible error. Although in our review of this case we are guided by our definitions in *Smith,* it does not necessarily follow that these particular definitions were necessary for the jury to determine whether the conduct of Clark was outrageously or wantonly vile, horrible, or inhuman in that it involved depravity of mind or aggravated battery of the victim.

---

[2] "The penalty of death shall not be imposed unless the Commonwealth shall prove beyond a reasonable doubt that there is a probability based upon evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which he is accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society, or that his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim." Code § 19.2-264.4(C).

## VIRGINIA'S DEATH PENALTY STATUTORY SCHEME

■ The defendant's challenge to the constitutionality of Virginia's capital murder statutes has been answered by our decisions in *Smith* v. *Commonwealth, supra,* and *Waye* v. *Commonwealth,* 219 Va. 683, 251 S.E.2d 202 (1979). The General Assembly has the power to define crimes, and the statutes in question are legislative enactments. The death penalty has been reserved for a very small number of extreme cases. The statutes reflect a responsible effort by the legislature to define the crimes for which death is appropriate and provide objective standards for the imposition of such penalty. *See Gregg* v. *Georgia, supra.*

■ Defendant argues that while the aggravating factors are listed within the verdict form provided by Code § 19.2-264.4(D), no mitigating factors are so listed. He says the jury is thereby "led" into finding the aggravating factors. We find no merit in this argument. The requirement of the statute that the aggravating factors be listed, and that discretion in sentencing be suitably directed and limited so as to minimize the risk of arbitrary and capricious action, is dictated by the holding in *Furman* v. *Georgia,* 408 U.S. 238 (1972), and in *Gregg, supra.*

The listing of aggravating factors benefits the accused because the jury is thereby limited to a consideration of statutory aggravating circumstances. On the contrary, a jury is not so limited in considering mitigating factors, but may consider any and all mitigating factors. *Lockett* v. *Ohio,* 438 U.S. 586 (1978). For reasons articulated in *Waye,* we reject defendant's attack on the form of the verdict.

We find no violation of *Mullaney* v. *Wilbur,* 421 U.S. 684 (1975). *Mullaney* was concerned with the proof of the elements of an offense necessary to establish guilt, not with factors of mitigation affecting sentencing. Aggravating factors must be proved by the Commonwealth beyond a reasonable doubt. Mitigating factors, like affirmative defenses, are matters that lie peculiarly within the knowledge of a defendant, and it is not a violation of the rule in *Mullaney* to require a defendant to produce evidence which is within his possession or is readily available to him.

■ We also reject the argument that the jury should have been instructed that its finding of mitigating factors need not be unanimous. Such an instruction is unnecessary and would have been confusing. Since only by unanimous agreement can the death penalty be inflicted, a disagreement by one or more of the jurors as to the proper sentence would, by statute, result in life imprisonment. Code § 19.2-264.4(E).

Clark complains that the jury did not specify which of the aggravating factors it found, *i.e.,* probability that defendant would commit criminal acts of violence in the future, or that defendant's "conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim." Code § 19.2-264.4(C). He says that the form authorized the jury to impose a penalty of death if it found the defendant's conduct involved depravity of mind *or* aggravated battery to the victim. In essence, defendant claims that the verdict of the jury should reflect unanimity as to which factor it finds.

The verdict returned by the jury against the defendant complies with the language of the statute. We have heretofore pointed out that the verdict of the jury, both as to guilt and as to penalty, must be a unanimous verdict. The circumstances under which punishment can be fixed at death are clearly set forth in the statute, and the trial court committed no error in following the language of the statute in instructing the jury.

In construing similar statutes involving aggravating factors and the phrases at issue here, courts have treated these factors as one unit. *Gregg, supra, Smith, supra,* and *Mason, supra.* In *Blake* v. *State,* 239 Ga. 292, 236 S.E.2d 637 (1977), the court held that a jury need not specify which portion of the factor it finds in order to fulfill the requirement that a verdict be unanimous. Further, in the instant case there were no objections on the ground now urged by the defendant, either to the verdict returned by the jury or to the instruction granted by the court.

The fact that the verdict form used by the trial court in instructing the jury in the instant case did not include the parentheses as indicated in Code § 19.2-264.4(D), was not a material or important variance. The most that the parentheses could accomplish would be to indicate which factor, *i.e.,* (torture), (depravity of mind), or (aggravated battery to the victim), the jury found. The death sentence would remain. As the Attorney General points out, this information might conceivably be of some value in a case involving the sufficiency of the evidence. This is not such a case.

Defendant's argument that the statutes are unconstitutional in that they permit imposition of death for satisfaction of a societal urge for retribution was rejected in *Gregg.* The constitutional objection made that the statutes do not offer sentencing alternatives, other than death or life, was rejected by us in *Smith.*

## ELIGIBILITY FOR PAROLE

 Defendant now complains that the jury should have been told that an accused sentenced to life imprisonment is eligible for parole after a certain number of years. In this case the jury inquired of the trial court, "Is parole possible under a decision of life imprisonment? If so, when?" The court, counsel for the defendant, and the Commonwealth's Attorney agreed upon the following answer, which was given: "In answer to your question on parole, the Court instructs the jury that in deciding sentence, you will not consider the question of parole." The defendant, having agreed upon the action taken by the trial court, should not be allowed to assume an inconsistent position. *Commonwealth* v. *Beavers,* 150 Va. 33, 142 S.E. 402 (1928). In addition, the response given by the trial court was a proper one. *Hinton* v. *Commonwealth,* 219 Va. 492, 247 S.E.2d 704 (1978). Parole and pardon are not proper matters for consideration by a jury.

## EXCESSIVE AND DISPROPORTIONATE PENALTY— PROSECUTORIAL DISCRETION

 The defendant contends that the trial court erred in not commuting his sentence to life imprisonment. He says that the sentence imposed upon him was excessive, disproportionate to penalties imposed in similar cases, and was due in part to the unconstitutional exercise of discretion by the Commonwealth's Attorney. To consider these assignments it is necessary that we refer again to the facts in this case. The undisputed evidence is that the defendant, without hesitation, agreed to kill George Harold Scarborough, a man whom he did not know, for $3,500. Together with Stewart, Clark planned the murder with great precision. They first checked the identity of the victim at his place of employment. After an initial attempt to kill their victim was frustrated, they returned to break into Scarborough's home and to lie in wait. There was ample time for Clark and Stewart to appreciate the enormity of the crime that they were about to commit. They spent three hours in Scarborough's townhouse awaiting his return. During this time they not only ate his food, but ransacked the premises to give the appearance of a killing by a burglar. Clark admits that while waiting for Scarborough, Stewart suggested that they abandon the project and abscond with the $1,200 advance payment. It was Clark who vetoed the suggestion, admittedly saying, "No, we're going to stay."

When the victim entered his home he was attacked by Stewart who attempted to chloroform him. When Scarborough resisted, the de-

fendant shot him five times, three times in the back and one or more times after the victim lay dying on the floor. Clark's explanation for shooting Scarborough while he was on the floor was, "Well, after everything had gone haywire, it was already attempted murder. He could identify both of us. Just had to make sure." After killing Scarborough, Clark removed the dead man's wallet, stole $435 therefrom and then, according to Clark, "threw the wallet back right on his stomach." The defendant expressed no remorse for the murder. In fact, the probation officer reported that Clark stated that he did not feel guilty or bad about his actions.

By way of mitigation, evidence was introduced showing that Clark, at nine years of age, sustained first-degree burns over approximately 40% of his body. These injuries required Clark's hospitalization for a period of eight months and necessitated 40 skin grafting operations. His mother and father testified that following his hospitalization, their son suffered a number of behavioral problems. The mother testified that "after he was burned, he always felt inferior."

Mrs. Clark also said that some years later, the defendant and his younger brother moved away from home and began "living a very fast life. They were hanging around with a lot of street people. They were into some heavy things . . . prostitution, drugs, pimps." During this period Clark's younger brother was murdered by an unknown assailant. The father testified that the defendant swore to avenge his brother's death. The defendant admitted having strong feelings about the murder and the failure of the police department to apprehend the murderer. Clark's mother, in explanation of her son's actions, testified: "Well, I feel that Jim's [sic] retaliated in the death of Scarborough because he didn't know the man, and that was his way of telling John [the younger brother who was murdered] that that was his way of doing something for him."

Prior to sentencing, Clark was examined by two psychiatrists. On August 7, 1978, Dr. Ludwig Fink reported that he was struck by Clark's "complete lack of emotion and of any affect." He said there was no question that Clark was competent to stand trial and was aware of the gravity of his offense. On November 20, 1978, based on a psychiatric examination and a study of the defendant's social history, Dr. William Allerton reported that he found "no evidence of a thinking disorder or anything I would consider a psychotic problem." Allerton wrote that Clark had an asocial view of life; that he considered Clark to be suffering from a character disorder, best described as "anti-social"; that Clark was not suffering from a mental illness; that he was mentally competent to understand the nature of the sentencing

process; that Clark "expressed some bitterness about the fact that the murderer of his brother was never found and obviously some regret that his act was differently handled, in that he was apprehended"; that Clark expressed no particular guilt in having participated in Scarborough's murder; and that he was fairly straightforward in indicating that the purpose of his participation was to obtain the money that was involved. Allerton further noted that the fact that the "macho"-"con man"-"hit man" type of male figure was one of Clark's models and that he looked up to such individuals because "they are able to carry a bankroll around, drive Cadillacs, etc."

The post sentence report prepared by Ms. Jennifer S. Joffe, probation and parole officer, although in great detail, contains no mitigating circumstances on behalf of the defendant.[3]

After reviewing the evidence, testimony, post sentence report, psychiatric reports and argument of counsel, the trial court denied the defendant's motion to set aside the sentence of death and pronounced sentence in accordance with the jury's verdict. The court concluded that the murder of Clark's younger brother and the defendant's extensive hospitalization for burns were not entitled to much weight as a mitigating factor in sentencing. It based its finding that the defendant's conduct constituted an "aggravated battery" upon the number of hollow-point bullets fired at close range, some of which were fired after the victim was on the floor.

Pursuant to Code § 17-110.1(C),[4] we find no evidence that the

---

[3] Joffe's report reads, in part, as follows:

Subject impressed this officer as a bright, or street-wise, individual, who has a fair amount of insight into himself. He was quite cooperative with this officer throughout the investigation and he spoke candidly about the issues discussed. In many respects, he seems immature and without self-control. At times, he appears rational and at other times he seems disturbed or irrational. The presence of serious psychological problems remains a possibility. His involvement in the instant offense reflects more than a continuation of past criminal activities, for in the past, his crimes were not against people. He has demonstrated anti-social behavior for most of his life. He respects values which are considered deviant in our society and his disrespect for the law enforcement system is apparent. This officer believes that in this offense, subject acted without moral restraint, and that he could be a serious threat to the community. In view of the above-mentioned factors, his actions, and the seriousness of the crime, this officer believes that in sentencing, the public welfare and safety must be the primary consideration.

[4] Virginia Code § 17-110.1(C) provides as follows:

In addition to consideration of any errors in the trial enumerated by appeal, the court shall consider and determine:

1. Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and

2. Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

sentence of death was imposed in this case under the influence of passion, prejudice, or other arbitrary factor. In determining whether the sentence imposed on Clark is excessive or disproportionate to the penalty imposed in similar cases, we have reexamined the capital murder cases involving the death penalty that we have reviewed since Code § 17-110.1(C) was enacted.

It would be difficult to uncover any case in which the brutality manifested at the time the murder was committed exceeded or equalled the brutality shown in *Smith, Waye* and *Mason*.[5] However, Clark's depravity of mind was as pronounced as the defendants' in the aforementioned cases. In particular, premeditation was shown in this case to a far greater degree than in any other case we have reviewed. Here the defendant had days during which he planned and prepared for a murder for hire. Clark and Stewart were fulfilling a contract and doing it in a careful, deliberate, and dispassionate manner. They had a job to do, for an agreed price, and they succeeded. But Clark and Stewart were not content with the $1,200 they had gotten or the $5,800 they were to receive. They robbed the corpse of an additional $435. They consumed the victim's food, stole his possessions, and celebrated his murder with their girl friends. They even called their coconspirator to announce, "The beast is deceased." Certainly, in no other case that we have reviewed is more callousness exhibited by the murderers.

We therefore find that the sentence of death imposed on Clark is not excessive or disproportionate to the penalties imposed in similar cases heretofore reviewed by this Court, considering both the crime and the defendant. This leaves unresolved only whether the sentence is disproportionate to the penalty imposed on Stewart.

The principals allegedly involved in the murder of Scarborough were his wife Jamie, Clark, Stewart, and Betty Holler. Robert F. Horan, Jr., the Commonwealth's Attorney, testified that Stewart and Holler "had a participation that was less, in my opinion, than that of James Clark and Jamie Scarborough," in that Clark was "the killer"; that "Stewart didn't kill"; and that "Mrs. Scarborough put up the money." Clark and Stewart were tried separately for capital murder, and in each case a jury convicted and fixed punishment at death. The court imposed the death sentence on Clark in accordance with the verdict of the jury. Stewart's death sentence was commuted by the court to life imprisonment. Jamie Scarborough was tried for capital

---

[5] This Court has previously reviewed another capital murder case involving the death penalty, *Johnson* v. *Commonwealth,* 220 Va. 146, 255 S.E.2d 525 (1979). *Johnson,* however, was reversed due to erroneously given jury instructions combined with improper argument by the prosecutor. Consequently, it is not pertinent to this review.

murder and was acquitted. Betty Holler was charged with first degree murder and, on the Commonwealth's Attorney's recommendation, was sentenced to twenty-five years in the penitentiary.

In discharge of the statutory mandate that we determine whether the sentence of death imposed on Clark is disproportionate to the sentence of life imprisonment imposed on Stewart, we must consider both the crime and the defendant. Considering the crime, murder for hire, and the facts and circumstances under which it was planned and committed, we find that the evidence fully supports each man's conviction of capital murder.[6] This finding leads us to a consideration of the rationale of the prosecuting officer and of the trial court that resulted in a commutation of Stewart's sentence. The Commonwealth's Attorney regarded Mrs. Scarborough as a major participant in her husband's murder. By the time her case was ready for trial, Clark, Stewart, and Holler had confessed to their part in the murder and had implicated Mrs. Scarborough. The Commonwealth's Attorney determined that for a proper presentation of the Commonwealth's case against Mrs. Scarborough, it was necessary that he introduce testimony in addition to that which would be provided by Holler. Horan received from Stewart a letter seeking a conference with him. At this conference, held prior to the Scarborough trial, Horan told Stewart "that if he got on the witness stand in the Scarborough case, told the truth, didn't try to embellish, didn't try to make himself look good, that I would recommend life imprisonment [for him] if I were satisfied that he had testified truthfully."

Clark also wrote Horan a letter asking to see him. The Commonwealth's Attorney visited Clark and asked him, "Have you given any thought to testifying against Scarborough?" He said the defendant replied, "Have you given any thought to releasing me on personal recognizance?" Horan testified that Clark did not appear too interested, that he "kind of smiled and laughed," and said that "he did not want to testify but he did indicate that he would talk it over with his family." Horan said his conversation with Clark ended with the understanding that the defendant would decide whether to testify and Horan would decide whether he was willing to make a commitment to recommend life imprisonment. Immediately thereafter, Horan received from Clark another letter in which the defendant said, "The way things stand I well [sic] have to be taken into the courtroom in a straight [sic] jacket to testify." Horan testified that after receipt of this letter, he

---

[6] Stewart's petition for a writ of error was denied, and the judgment of the lower court was affirmed. *Stewart* v. *Commonwealth,* Record #27466.

decided he would not use Clark because he thought "James Clark was too wild, that he would consider it a lark and that he might indicate anything on the stand." Clark's trial attorney testified that after the Scarborough trial had begun, he went to the Commonwealth's Attorney and told him that Clark "was ready, willing and able to testify at that point in time." However, Horan emphasized that he had never made any agreement or commitment to use the defendant as a witness.

The decision of the Commonwealth's Attorney to recommend that Stewart's sentence be commuted was influenced not alone by Stewart's agreement to testify in the Scarborough trial, but also by other considerations:

(1) Stewart was not the "trigger-man." He did not kill Scarborough.

(2) From the time of his arrest Stewart maintained that it was his desire to abandon the plan to murder Scarborough, but he was prevented from doing so by Clark. The Commonwealth's Attorney testified that he had reservations about the truthfulness of this claim by Stewart until Clark admitted, on the witness stand during his sentencing proceeding, that on the night of the killing he refused to go along with Stewart's request to abandon the project and simply take the $1,200 advance payment. Horan said that at the time Clark made this statement, the defendant had nothing to gain, and that it came simply as a by-product of his testimony.

(3) Stewart did testify in the Scarborough case, and Horan said that his testimony was straightforward, uncolored and truthful.

(4) Stewart had also indicated a willingness to testify against Betty Holler if she had not pled guilty to her participation in the murder.

While the trial judge observed that Stewart expressed remorse for the murder and that his degree of culpability was somewhat less than that of Clark, it is clear that Stewart's sentence was commuted primarily because of his cooperation with the prosecution in testifying for the Commonwealth in the case against Jamie Scarborough. Stewart could not be used as a witness in the case without his consent. In the judgment of the Commonwealth's Attorney, the ends of justice demanded that Stewart testify, although at the price of a recommendation by the prosecutor that Stewart's death sentence be commuted to life imprisonment. That the prosecution of Mrs. Scarborough was not successful is of no moment here. As Mr. Justice White observed in his dissent in *Roberts* v. *Louisiana,* 428 U.S. 325, 348-49 (1976):

Of course, someone *must* exercise discretion and judgment as to what charges are to be filed and against whom; but this essential

process is nothing more than the rational enforcement of the State's criminal law and the sensible operation of the criminal justice system.

We find no abuse of discretion by the Commonwealth's Attorney and no action by him that was arbitrary or capricious. Horan's use of Stewart instead of Clark in the Scarborough trial, or instead of using both men as witnesses, was done in the exercise of prosecutorial discretion and judgment, based upon differences in the attitudes and willingness of the two men to testify, their records, their culpability, and their credibility. It was not an arbitrary or irrational decision by the prosecutor, and it was neither inexplicable, freakish nor a violation of the eighth amendment. *See Roberts* v. *Louisiana, supra,* 428 U.S. at 349, and cases there cited.

Only in capital murder cases has the death penalty been imposed in Virginia since the enactment of its capital murder statutes in 1977. *Smith, Waye* and *Mason* involved no codefendants. In *Stamper* v. *Commonwealth,* 220 Va. 260, 257 S.E.2d 808 (1979), this day decided, we affirmed the defendant's death sentence, even though a codefendant, tried by a different jury, received substantially less punishment for his part in the commission of a murder for which Stamper was convicted. We found valid reasons for the different punishments imposed upon the respective defendants.

In *Coppola* v. *Commonwealth,* 220 Va. 243, 257 S.E.2d 797 (1979), also this day decided, we affirmed the defendant's death sentence, although he contended that his sentence was disproportionate to that imposed on his confederates. We said that "[a] determination of proportionality of punishment requires only that a defendant's death sentence not be incommensurate with his conduct, measured by other jury decisions, on a statewide basis, involving similar conduct." 220 Va. at 259, 257 S.E.2d at 808. Additionally we noted that significant discretion adheres in our criminal justice process, and that therefore comparisons between the penalties accorded codefendants may be unproductive. And because discretion necessarily vests at different levels of our criminal justice system, we do not require that the sentences imposed upon two codefendants appear proportionate. In *Gregg* v. *Georgia,* 428 U.S. 153 (1976), a closely related point was involved and ruled upon. In dismissing an objection that prosecutorial authority retains a constitutionally impermissible degree of discretion in deciding whom to prosecute and with whom to plea bargain, the Court stated:

The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. . . . Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. 428 U.S. at 199.

Separate juries have found both Clark and Stewart guilty and recommended the imposition of the death penalty on each. The circumstances surrounding the commutation of Stewart's sentence have been detailed. We cannot find from the record before us that the sentence imposed upon Clark is due to the unconstitutional or improper exercise of discretion by the Commonwealth's Attorney. The most that can be said is that had the defendant's degree of participation in the murder been less, and his attitude, record and actions been different, he may have been used as a witness for the prosecution in the Scarborough trial, and his sentence may also have been commuted. However, this is not to say that the sentence he received is disproportionate to the sentence received by Stewart.

We observe here, as we did in *Smith*, "to the extent we can make a meaningful comparison with other capital cases decided in this Commonwealth," 219 Va. at 482, 248 S.E.2d at 151, we hold that the penalty imposed on Clark was not disproportionate. We find no reversible error in the defendant's conviction and sentence, and no other reason to disturb or commute his death sentence. The judgment of the lower court is

*Affirmed.*