GREGORY DAVID FRYE

V.

COMMONWEALTH OF VIRGINIA

Record Nos. 850793 and 850794

June 13, 1986

Present: All the Justices

*J. Chris Alderson; Edward K. Stein (St. Clair, Alderson & Stein,* on brief), for appellant.

*James William Osborne for appellant,* on ineffective assistance of counsel claim.

*Robert B. Condon, Assistant Attorney General (Mary Sue Terry, Attorney General,* on briefs), for appellee.

COCHRAN, J., delivered the opinion of the Court.

A jury found Gregory David Frye guilty of the capital murder of James LeRoy Biggs, a law enforcement officer, Code § 18.2-31(f), and use of a firearm in the commission of a felony, Code

§ 18.2-53.1. The jury fixed Frye's punishment for use of a firearm at two years' imprisonment. In the second phase of the bifurcated trial, the jury heard evidence of aggravating and mitigating circumstances and, finding a probability that Frye would commit criminal acts of violence that would constitute a continuing threat to society, fixed his punishment for capital murder at death. Code §§ 19.2-264.2 to -264.4. After consideration of the post-sentence report required by Code § 19.2-264.5, the trial court by order entered July 3, 1985, sentenced Frye in accordance with the jury verdicts.

Frye noted his appeal of the non-capital conviction to the Court of Appeals. Code § 17-116.05:1. We certified that appeal (Record No. 850794) to this Court under the provisions of Code § 17-116.06 for consolidation with the appeal of the capital murder conviction and the sentence review mandated by Code § 17-110.1 (Record No. 850793).

## I. FACTS

James LeRoy Biggs, a Virginia State Police sergeant, was shot in the chest and killed on December 18, 1984, in the course of a routine stop of an automobile driven by Frye. James Henderson Price, Frye's passenger, testified Frye fired the fatal shots. Frye, however, testified it was Price who killed Sergeant Biggs.

Frye had escaped from the West Virginia prison system in July 1984 and, by his own admission, had embarked on a crime spree in November and December to support himself and Price and to sustain their drug use. Bound for West Virginia on Interstate 64 in a stolen car, the two were stopped by Sergeant Biggs for speeding about 2:30 p.m. in Alleghany County two miles east of the West Virginia line. Sergeant Biggs walked toward the driver's side of the vehicle. Two shots, fired from a handgun in the car, struck the officer, who fell mortally wounded, and the vehicle sped away. Driving into West Virginia, Frye was stopped on Route 60 by a West Virginia State Police trooper, who fired into the car five shots from a shotgun, seriously wounding Price. Again driving away at high speed, Frye soon collided with another vehicle. Leaving Price in the wrecked car, Frye fled into the woods on foot but was captured about 2:15 a.m. the next morning and taken to the Rupert, West Virginia, fire station, where in the course of interrogation he confessed that he had shot the officer. Over Frye's objection, this confession and other inculpatory statements he made

during his pretrial incarceration were introduced into evidence at trial.

A .44-caliber magnum pistol was found in the wreckage of the automobile driven by Frye. Forensic analysis revealed that this weapon fired the shots that killed Sergeant Biggs.

## II. PRETRIAL PROCEEDINGS

### A. *Motion to Suppress.*

Frye moved unsuccessfully before trial to suppress his confession. On appeal, he challenges its admissibility, as he did below, on three separate grounds: first, that an unreasonable period elapsed before he was presented to the magistrate; second, that he was not properly advised of his constitutional rights; and, third, that his confession was coerced.

The evidence showed that when Frye arrived at the Rupert fire station, numerous police officers, news reporters, and cameramen were assembled. Frye was taken into an office for questioning. Three officers were present during the interrogation, Tex Chapman, a Virginia State Police investigator, J. R. Ruhland, Chapman's supervisor, and R. B. Bright, a West Virginia State Police officer.

According to Chapman, it had rained "on and off" during the night and early morning hours before Frye's arrest. Frye's hair was wet, his clothes wet and muddy, but he did not appear to Chapman to be nervous, upset, or tired. He was given an opportunity to eat, drink, or use the bathroom, but he declined. Prior to the interview Frye said he was cold, but he did not request a coat or blanket. The room in which he was questioned was warm. When Frye asked for a cigarette, he was told he would be given one later.

Chapman said he and Frye talked about five minutes before he began recording their interview. During that time, he read Frye a statement of his constitutional rights from a standard police form. Frye indicated he understood his rights and was willing to talk to Chapman. For 19 minutes the interrogation was recorded. During this time, Frye denied any participation in or knowledge of the crime. The recorder was then turned off; Frye was offered a cigarette and his handcuffs were removed. His hands had been cuffed behind his back, but the handcuffs were reapplied with his hands in front of his body. The recorder remained off approximately 12

minutes. During this period, Ruhland talked to Frye, stating facts of the shooting known to the police. The recorder was again turned on and Frye confessed; he was then immediately presented to a magistrate and formally charged. Frye's motion to suppress this confession was overruled and the confession was admitted into evidence at the guilt phase of the trial.

Frye contends that he was not taken before a magistrate without unnecessary delay as required by West Virginia Code § 62-1-5 (1984).[1] Assuming, without deciding, West Virginia law to be applicable, the trial court found there was no "unnecessary delay" in presenting Frye. Frye urges that the West Virginia law governing prompt presentment should apply, not Virginia law, and that, under decisions interpreting the Code provision,[2] his detention violated § 62-1-5 and required exclusion of any statements elicited as a result of the delay in taking him before a magistrate.

The Commonwealth responds that it would be an "absurdity" for us to apply West Virginia's statute governing delay in presentment in the case of a crime committed in Virginia and the ensuing apprehension and interrogation of a suspect in West Virginia when, faced with the inverse of this situation, the West Virginia Supreme Court did not apply Virginia's statute on this issue.[3] This argument, however, is not persuasive. While rules of comity rest in part on the principle of reciprocity, courts should refuse to make reciprocity the test for recognition of rights acquired under foreign law. Generally, comity does not require that courts of the forum state give effect to similar rights arising under the law of

---

[1] West Virginia Code § 62-1-5 provides:
 An officer making an arrest under a warrant issued upon a complaint, or any person making an arrest without a warrant for an offense committed in his presence, shall take the arrested person without unnecessary delay before a justice [magistrate] of the county in which the arrest is made. When a person arrested without a warrant is brought before a justice [magistrate], a complaint shall be filed and a warrant issued forthwith. The officer executing the warrant shall make return thereof to the justice [magistrate] before whom the defendant is brought.

[2] See State v. Mays, 307 S.E.2d 655 (W. Va. 1983); State v. Mitter, 289 S.E.2d 457 (W. Va. 1982); State v. Persinger, 286 S.E.2d 261 (W. Va. 1982); State v. Mason, 249 S.E.2d 793 (W. Va. 1978).

[3] In State v. Guthrie, 315 S.E.2d 397 (W. Va. 1984), the defendant was arrested in Virginia on a fugitive warrant for a crime allegedly committed in West Virginia. Accompanied by Virginia officers, West Virginia officers arrested the defendant, took him to local police headquarters, interrogated him, eliciting a confession, and then took him before a magistrate. Without analyzing the choice-of-law problem presented by the facts, the court applied the West Virginia statute. 315 S.E.2d at 402.

the foreign state. *McFarland* v. *McFarland*, 179 Va. 418, 432, 19 S.E.2d 77, 84 (1942); *State of Maryland* v. *Coard*, 175 Va. 571, 579-80, 9 S.E.2d 454, 457-58 (1940).

■ In cases involving choice-of-law questions, Virginia adheres to the use of traditional rules applicable to conflicts of laws. *See McMillan* v. *McMillan*, 219 Va. 1127, 1129-31, 253 S.E.2d 662, 663-64 (1979) (rejecting the "most significant relationship" analysis adopted by the Restatement (Second) of Conflict of Laws). Under such rules, questions of substantive law are governed by the law of the place of the transaction or the place where the right is acquired (*lex loci*), while questions of procedure and remedy are governed by the law of the place where the action is brought (*lex fori*). *Willard* v. *Aetna*, 213 Va. 481, 483, 193 S.E.2d 776, 778 (1973); *Vicars* v. *Discount Company*, 205 Va. 934, 937-38, 140 S.E.2d 667, 670 (1965); *Coard*, 175 Va. at 580-81, 9 S.E.2d at 458; *Baise* v. *Warren*, 158 Va. 505, 508, 164 S.E. 655, 656 (1932). We must determine whether the issue to be resolved is one of procedure or substance, and this determination is made in accordance with forum law. *Willard*, 213 Va. at 483, 193 S.E.2d at 778.

■ Under Virginia law, an arresting officer must take an accused before a judicial officer with reasonable promptness and without unreasonable delay. Code § 19.2-82; *Holt* v. *City of Richmond*, 204 Va. 364, 367, 131 S.E.2d 394, 396 (1963), *cert. denied*, 376 U.S. 917 (1964). Violation of this requirement reaches constitutional dimension only if it results in the defendant's loss of exculpatory evidence. *Horne* v. *Commonwealth*, 230 Va. 512, 519, 339 S.E.2d 186, 191 (1986);[4] *Winston* v. *Commonwealth*, 188 Va. 386, 394, 49 S.E.2d 611, 615 (1948). Failure promptly to present a defendant as required by Code § 19.2-82 is a mere procedural violation where it involves no constitutional error. *See Tharp* v. *Commonwealth*, 221 Va. 487, 490, 270 S.E.2d 752, 754-55 (1980) (Code § 19.2-76, requiring presentation before a magistrate of a certain territorial jurisdiction, is procedural, not rising

---

[4] In *Horne*, the trial court cited Code § 19.2-76 in determining there was unnecessary delay in presenting the defendant before a magistrate. It is Code § 19.2-82, not § 19.2-76, which prohibits unnecessary delay. The *Horne* decision, based on the rule of Code § 19.2-82, and the cases cited therein interpreting the predecessor of this statute (§ 4827a (b) Code 1942), held that violations of the prompt presentment requirement would not result in exclusion of inculpatory evidence. 230 Va. at 518-19, 339 S.E.2d at 191.

to constitutional dimension and not requiring application of exclusionary rule). Frye alleges no such error in this case.

■ Holding as we do that the prompt presentment requirement is procedural, we will apply the Virginia law on this issue. Assuming, without deciding, that the arresting officers failed to present Frye to the magistrate before an unreasonable period of time had elapsed, thereby violating Code § 19.2-82, we hold that this violation does not result in exclusion of the confession obtained from Frye in the interim interrogation. *Campbell* v. *Commonwealth*, 194 Va. 825, 831, 75 S.E.2d 468, 472 (1953) (confession admissible); *see Horne*, 230 Va. at 519, 339 S.E.2d at 191 (evidence developed during unlawful detention admissible); *Holt*, 204 Va. at 368, 131 S.E.2d at 397 (conviction not necessarily invalidated on due process grounds following illegal detention); *McHone* v. *Commonwealth*, 190 Va. 435, 442, 57 S.E.2d 109, 113 (1950) (same).

■ Frye also argues that his confession should have been suppressed because he was not properly advised of his rights under *Miranda* v. *Arizona*, 384 U.S. 436 (1966). He contends that, because the interrogating officers failed to record their actual recitation of rights and Frye's waiver, the Commonwealth failed to show that he knowingly and intelligently waived his privilege against self-incrimination and his right to counsel. This argument is without merit. There is no constitutional requirement that, to be valid, the advice of rights must be recorded or the accused's waiver of rights must be in writing. *See, e.g., Poyner* v. *Commonwealth*, 229 Va. 401, 407-08, 329 S.E.2d 815, 821-22, *cert. denied*, 474 U.S. ___, 474 U.S. ___, 474 U.S. ___ (1985). Moreover, Frye executed a written waiver-of-rights form at the conclusion of his questioning. A trial court's finding that a statement was voluntarily made upon a waiver of rights knowingly and intelligently given is a finding of fact based on the totality of the circumstances and may not be reversed unless plainly wrong. *Watkins* v. *Commonwealth*, 229 Va. 469, 477, 331 S.E.2d 422, 429-30 (1985), *cert. denied*, 475 U.S. ___ (1986); *Jones* v. *Commonwealth*, 228 Va. 427, 441, 323 S.E.2d 554, 561 (1984), *cert. denied*, 472 U.S. 1012 (1985); *Stockton*, 227 Va. 124, 140, 314 S.E.2d 371, 381, *cert. denied*, 469 U.S. 873 (1984). Chapman's testimony provided sufficient evidence to support the trial court's finding that the *Miranda* warnings were properly given and that Frye orally waived his rights at the outset of the interview.

■ Frye contends, however, that the initial *Miranda* warnings were ineffective after the interrogation was interrupted. Upon resumption of questioning, he says, a statement of his rights should have been repeated. In cases in which questioning has been resumed following interruption of a custodial interrogation where a valid waiver was initially given, the trial court must determine in view of the totality of the circumstances whether the accused knowingly and intelligently relinquished or abandoned his rights. *Washington* v. *Commonwealth*, 228 Va. 535, 548, 323 S.E.2d 577, 586 (1984), *cert. denied*, 471 U.S. 1111 (1985); *see Bunch* v. *Commonwealth*, 225 Va. 423, 433, 304 S.E.2d 271, 276, *cert. denied*, 464 U.S. 977 (1983). Where a defendant has received *Miranda* warnings and has given a knowing and intelligent waiver of his constitutional rights, the waiver is presumed to continue through subsequent interrogations until he manifests a desire to revoke it. *Washington*, 228 Va. at 548-49, 323 S.E.2d at 586. There is no evidence that Frye ever manifested a desire to revoke his initial oral waiver. Upon resumption of questioning following the 12-minute interruption, Ruhland reminded Frye of his "rights as we gave them to you before," and Frye made no effort to effect a revocation of his earlier waiver. Moreover, at the conclusion of the interrogation, he signed a written waiver-of-rights form.

■ At the suppression hearing Frye testified that when he was brought to the Rupert fire station he was tired, wet, and scratched and that the officers refused his request for a blanket and a cup of coffee. He testified that he did not remember receiving his *Miranda* warnings and that he feared for his safety. On appeal, citing his age, his physical condition, and the presence of a large number of armed officers at the fire station, Frye says his confession was the result of coercive circumstances and was therefore involuntary. But the trial court obviously believed Chapman's testimony which rebutted Frye's. The entire interrogation lasted less than an hour and a half. Frye was a man of 22 years, experienced in the criminal justice system. The trial court found that Frye's confession was not coerced but was made freely and voluntarily. Holding that this factual finding was supported by credible evidence, we will not disturb it.

■ Frye's motion to suppress was directed also at two other statements he made to law enforcement officers. The evidence showed that about 9:00 a.m. on December 19 Frye appeared in court, waived extradition, and requested that counsel be appointed

to represent him. He was taken to Covington that afternoon, where in response to questioning by Robert H. Perry, III, a special agent with the Virginia State Police, he made incriminating statements.

Frye was again interviewed on the morning of December 20 by D. L. Cale, an investigator in the Alleghany County Sheriff's Department. Cale testified that on December 19 he was leaving the jail on another assignment when Frye said he wanted to talk when Cale returned. The next morning Cale went to Frye's cell and asked if Frye still wanted to talk to him. Cale said he was unaware that Frye had requested counsel or that he was to be arraigned that morning. Cale also said he began the interview by advising Frye of his constitutional rights. During this interview, Frye made incriminating statements.

Frye challenged the admissibility of the statements to Perry and Cale. He argued that the statements were inadmissible under *Edwards* v. *Arizona*, 451 U.S. 477, 484-85 (1981), in which the Supreme Court held that an accused who has invoked his right to counsel is not subject to further interrogation by the police until counsel has been made available, unless the accused himself initiates further conversations with the police. The trial court ruled that, although the statement to Perry, given in response to questioning initiated by Perry, was inadmissible under *Edwards*, the statement to Cale was the result of contact initiated by Frye and was freely and voluntarily made after a knowing and intelligent waiver of his rights. The statement, a detailed confession by Frye, was admitted in the sentencing phase of the trial. We agree with the trial court's ruling that this statement was admissible under the *Edwards* exception as a communication initiated by the accused. *Cf. McFadden* v. *Commonwealth*, 225 Va. 103, 110, 300 S.E.2d 924, 927-28 (1983).

On appeal, Frye also contends the statement to Cale should have been excluded because it flowed from and was tainted by the invalidity of the initial statement to Chapman. Having ruled that the statement to Chapman was admissible, we find no merit in this contention.

### B. *Motion to Disqualify Assistant Commonwealth's Attorney.*

Less than one week before trial, the court entered an *ex parte* order appointing Michael McHale Collins assistant Commonwealth's attorney in the case. Collins took the required oath of

office two days prior to trial. On the opening day of trial, Frye challenged the appointment of Collins and moved that he be disqualified. He objected to the *ex parte* nature of the order, stating that he had received notice of Collins's appointment less than two days before. He further argued that the appointment was improper, alleging that Collins's participation would create a conflict of interest for the prosecution and a hardship for the defense.

During oral argument on Frye's motion, the court stated for the record that, at the time of trial, Collins was a law partner of the Commonwealth's attorney in his civil practice. Collins had formerly been the Commonwealth's attorney for Alleghany County and had also served as assistant Commonwealth's attorney. The Commonwealth's attorney represented to the court that Collins was assistant Commonwealth's attorney at the time of this offense and for the three months following; in that capacity, he had participated in the proceedings at the time of Frye's arraignment, preliminary hearing, and waiver of indictment.

The trial court remarked that it had been clear to the court and to defense counsel that Collins had been participating in the case from its inception. Apologizing for the *ex parte* nature of its order, the court explained that the order was entered as an administrative matter to reflect for the record Collins's participation in the case.

On the issue of Collins's conflict of interest, defense counsel stated for the record that Collins was a director of the State Bank of the Alleghenies, where the widow of Sergeant Biggs was employed as administrative assistant. Collins represented that his involvement had nothing to do with his association with the bank or its employment of Mrs. Biggs; rather, it was the result and continuation of his prior employment as an assistant Commonwealth's attorney. He denied any employment in the case by anyone other than Alleghany County. The trial court ruled there was no conflict of interest and denied Frye's motion to disqualify Collins.

■ There was no reversible error in the court's order appointing Collins. The Commonwealth's attorney is authorized to employ his own assistants, and no court approval is required. Code § 15.1-9. As the court's order was unnecessary, no prejudice resulted to Frye from its *ex parte* entry.

*Cantrell* v. *Commonwealth*, 229 Va. 387, 329 S.E.2d 22 (1985), is inapposite. In *Cantrell*, we reversed the conviction of a defendant prosecuted by an attorney who was privately employed

by the victim's family. The attorney had a conflict of interest in the case because the defendant's conviction would benefit the attorney's clients in a child-custody proceeding for which the attorney had been employed and in other civil litigation which might arise. *Id.* at 391-94, 329 S.E.2d at 24-27.

No such conflict has been demonstrated in this case. Frye proffered no evidence of Collins's employment as a private attorney for Mrs. Biggs in this prosecution or in any related civil litigation. Although no evidence was taken, the court's decision was based upon uncontradicted statements of fact made by counsel. Accordingly, the trial court correctly ruled there was no conflict of interest requiring disqualification of Collins.

## C. *Physical Restraints Imposed on Frye.*

Frye objected to being restrained by chains or handcuffs at trial, arguing that physical restraints visible to the jury would be prejudicial. The Commonwealth argued that security interests required some form of restraint. Attempting to "strike a balance" between these competing interests, the trial court ruled that Frye's initial appearance at counsel table could be made without any restraints, with leg restraints to be attached after the jury panel had been selected. Frye declined the court's offer to give the jury a cautionary instruction explaining that the restraints were applied as a routine security measure.

While we agree that requiring a defendant to stand trial in physical restraints may create prejudice in the minds of jurors by suggesting that the defendant is dangerous or that his guilt is a foregone conclusion, we also believe that in extraordinary cases such shackling of the defendant is necessary to protect the rights of those present in the courtroom and society at large. *See State* v. *Tolley,* 290 N.C. 349, 365-67, 226 S.E.2d 353, 366-67 (1976), and authorities cited therein.

In Virginia, the conduct of a trial is committed to the discretion of the trial court. *Watkins,* 229 Va. at 484, 331 S.E.2d at 433; *Justus* v. *Commonwealth,* 222 Va. 667, 676, 283 S.E.2d 905, 910 (1981), *cert. denied,* 455 U.S. 983 (1982). Therefore, the question is whether the trial court abused its discretion in requiring that Frye be secured by leg restraints.

A trial court may consider various factors in determining whether a defendant should be restrained, such as the seriousness of the charge, the defendant's temperament, age, and physical at-

tributes, his criminal record, and any past escapes, escape attempts, or threatened misconduct. *See Tolley*, 290 N.C. at 368, 226 S.E.2d at 368. This determination need not be made upon a formal hearing, and the information upon which it is based need not be evidence formally offered and admitted at trial. *Id.* Given the gravity of the offense charged and the evidence of Frye's propensity for violent crime and escape, we hold that the trial court did not abuse its discretion in determining that, in the interest of security, Frye should be restrained.

### D. Motion to Exclude Late-Disclosed Evidence.

Under the court's discovery order, the Commonwealth was directed to make available to the defense any relevant statements which the Commonwealth's attorney knew had been made by Frye to any law enforcement officers or others. On June 5, 1985, before the trial began, the Commonwealth provided a supplemental discovery response which disclosed several such statements. In this response the Commonwealth stated that Frye had telephoned Covington newspaper reporter Natalie Austin, given his name and said, "I'm the one that shot the trooper." The Commonwealth also disclosed evidence of a plan by Frye to attempt to escape from the Alleghany County jail.

Frye objected to the Commonwealth's late disclosure of this evidence and moved that it be excluded. The trial court ruled that the evidence could not be used in the Commonwealth's case-in-chief, but deferred ruling whether the evidence could be admitted on rebuttal or in the sentencing phase.

Testifying in his own behalf in the guilt phase, Frye admitted he telephoned the local newspaper requesting that copies of the paper be sent to his cell, but he denied making any incriminating admission. Austin was then permitted to testify in rebuttal, over Frye's objection, that Frye had told her in the telephone call, "This is Greg Frye, the one who shot the state trooper." Frye's counsel acknowledged that he had been informed of the nature of Frye's admission on May 1, and had been given the reporter's name on May 30, five days before trial began.

Upon Frye's conviction in the guilt phase of the trial, the Commonwealth introduced in the sentencing phase evidence of his purported escape plan. Jefferson G. Armentrout, an inmate of the jail, testified that, while he was in the cell next to Frye's, Frye asked him for help in attempting an escape. Frye asked Armen-

trout to smuggle into the jail a hacksaw handle and blades in return for a share in $27,000 that Frye said he had previously stolen. According to Armentrout, Frye gave him a handwritten map showing the site where the money was buried. Armentrout gave the map to Investigator Cale. Cale testified that he attempted to locate the area in Chesterfield County depicted on the map. Although he found the map to be "very accurate," Cale said he did not find the money because certain trees marking the exact location of the hiding place had been removed during recent construction at the site. The map and a note Frye had written Armentrout about obtaining the hacksaw were admitted as exhibits.

Frye contends admission of Austin's testimony and the evidence of an escape plan denied him due process by denying him an adequate opportunity to evaluate the evidence against him and prepare for trial. There is no constitutional right to discovery in a criminal case. *Lowe* v. *Commonwealth*, 218 Va. 670, 679, 239 S.E.2d 112, 118 (1977), *cert. denied*, 435 U.S. 930 (1978).

Rule 3A:11 governing discovery in criminal cases establishes that, upon timely written motion, the accused is entitled to discover "written or recorded statements or confessions made by the accused, or copies thereof, or the substance of any oral statements or confessions made by the accused to any law enforcement officer, the existence of which is known to the attorney for the Commonwealth." The trial court ordered the Commonwealth to furnish these statements and, in addition, any such statements made to persons other than law enforcement officials. The Commonwealth's late disclosure of the alleged statement to Austin and the purported escape plan, while violating the trial court's order, did not violate Rule 3A:11. The court, in its discretion, fashioned a remedy to redress the Commonwealth's violation of its order, excluding use of the late-disclosed evidence in the Commonwealth's case-in-chief. We cannot say this action was an abuse of the court's discretion.

Furthermore, even assuming the evidence was within the scope of Rule 3A:11, we find no error in the court's action. The relief to be granted upon a violation of Rule 3A:11 is within the discretion of the trial court, giving due regard to the right of the accused to call for evidence in his favor and to investigate and evaluate the evidence in preparation for trial. *See* Va. Const. art. I, § 8; *Lomax* v. *Commonwealth*, 228 Va. 168, 172, 319 S.E.2d 763, 765 (1984); *Gilchrist* v. *Commonwealth*, 227 Va. 540, 546-47, 317

S.E.2d 784, 787 (1984). In certain cases, a court may insure this right only by granting a continuance to allow the accused an opportunity to assess and develop the evidence for trial. *See, e.g., Lomax*, 228 Va. at 172-73, 319 S.E.2d at 765-66. In the present case, however, Frye failed to move for a continuance or even for a recess in order to consider the material. He will not now be heard to complain that he had insufficient time to prepare for trial.

### E. Limitation of Voir Dire.

Frye argues that the trial court improperly limited his counsel on *voir dire* examination of prospective jurors. The record reveals that, although they were not transcribed, discussions between the court and counsel were held prior to trial regarding the questions to be asked upon *voir dire*. Immediately prior to *voir dire*, the trial court gave defense counsel the opportunity to suggest questions for the court to ask other than the ones discussed. The court then questioned the first prospective juror.

After concluding its examination, the trial court allowed defense counsel to ask additional questions. Frye's attorney examined this venireman extensively about the Commonwealth's burden of proof and the defendant's presumption of innocence. On Frye's motion, the court ultimately excluded this prospective juror for cause. The court then admonished Frye's attorney, "You are going too far with your questions . . . . You are trying to make law professors out of these people, and you can't do it . . . . I am not going to let you sit there and cross-examine these jurors, and confuse them like you did this last one." Acknowledging that it had failed to question the excluded venireman about the burden of proof and the presumption of innocence, the court announced that it would include such questions in its own examination of prospective jurors, and did so. Following its examination of each venireman, the court allowed defense counsel to ask additional questions, including inquiry into the venireman's understanding of the burden of proof and the presumption of innocence.

In view of the length and character of defense counsel's examination of the first venireman, the trial court was justified in taking upon itself the responsibility for this inquiry. "A party has no right, statutory or otherwise, to propound any question he wishes, or to extend *voir dire* questioning *ad infinitum*." *LeVasseur* v. *Commonwealth*, 225 Va. 564, 581, 304 S.E.2d 644, 653 (1983), *cert. denied*, 464 U.S. 1063 (1984). The court acted

within the scope of its discretion in determining that its examination, with the opportunity afforded defense counsel for supplemental examination, was sufficient to preserve Frye's right to a fair trial by an impartial jury. *See Poyner*, 229 Va. at 414-15, 329 S.E.2d at 825-26; *LeVasseur*, 225 Va. at 582, 304 S.E.2d at 653.

### F. Exclusion for Cause of Prospective Jurors.

Frye argues that the exclusion of two jurors, David Spivey and Thomas West, for their unequivocal opposition to the death penalty, pursuant to *Witherspoon* v. *Illinois*, 391 U.S. 510, 522 (1968), denied him trial by a jury representing a cross-section of the community. He also advances the argument that exclusion of prospective jurors who hold such firm convictions against the death penalty results in a jury that is prone to convict at the guilt phase. *See Grigsby* v. *Mabry*, 758 F.2d 226 (8th Cir. 1985), *rev'd sub nom.*, *Lockhart* v. *McCree*, 476 U.S. ___, 106 S.Ct. 1758 (1986).

The Supreme Court recently rejected these arguments, holding that such exclusion does not violate a defendant's Sixth Amendment right to a representative and impartial jury. *Lockhart* v. *McCree*, 476 U.S. ___, ___, 106 S.Ct. 1758, 1767 (1986); *see also Boggs* v. *Commonwealth*, 229 Va. 501, 515, 331 S.E.2d 407, 417 (1985), *cert. denied*, 475 U.S. ___, 106 S.Ct. 1240 (1986); *Poyner* v. *Commonwealth*, 229 Va. at 413-14, 329 S.E.2d at 825. Thus, there was no error in the exclusion of these two jurors for cause.

### G. Constitutionality of Capital Murder Statutes.

Prior to trial, Frye moved to dismiss the charges against him on the ground that the Virginia statutes governing capital murder are unconstitutional, both facially and as applied to him. The trial court overruled the motion. On appeal, Frye adopts all previous attacks on the validity of the statutes.

We adhere to our prior rulings upholding the constitutionality of Code § 18.2-31, classifying capital offenses, and of Code §§ 19.2-264.2 to -264.4, outlining sentencing procedures in capital cases. *See Stockton*, 227 Va. at 134-35, 314 S.E.2d at 378. Frye's attack on the constitutionality of the statutes as applied to him is made at the penalty phase and, for reasons hereafter set forth, is not reached.

## III. THE GUILT PHASE

### A. Failure to Disclose Exculpatory Evidence.

On March 21, 1985, the court ordered the Commonwealth to disclose all information known to it which tended to exculpate Frye. The Commonwealth responded to this order on April 8 and supplemented its response on the first morning of trial. Neither of these responses disclosed the existence of any forensic evidence resulting from analysis of gunshot residue.

As part of his defense, Frye offered the testimony of George D. Watts, a Virginia State Police special agent, concerning a test for gunshot residue on an unidentified person's hand. He introduced as an exhibit, over the Commonwealth's objection, a certificate of analysis of gunshot residue found in samples taken as part of the investigation of the Biggs shooting. The certificate named both Frye and Price as suspects, but it failed to identify the person from whom the samples had been taken. In argument on the admissibility of this certificate, defense counsel stated that the certificate had been filed with the court by the Commonwealth more than a week prior to trial. In closing argument, counsel relied on the inconclusiveness of this analysis to argue that the Commonwealth failed in its burden by not showing that it was Frye, rather than Price, who had gunshot residue on his hands.

Frye contends that the gunshot-residue test was in fact conducted on Price and that presence of residue on Price's hands tended to exculpate Frye. He alleges the Commonwealth failed to comply with the disclosure order by not disclosing the report itself and by not disclosing the chain of custody of the residue samples. There is no merit to this argument. The inconclusive certificate, admitted in evidence on Frye's motion, was not shown to be exculpatory. Frye will not be heard to complain now of evidence which he introduced. *Moore* v. *Commonwealth*, 211 Va. 569, 570, 179 S.E.2d 458, 460 (1971).

### B. Admission of Certain Testimony and Exhibits.

John W. Boone, a dispatcher with the Virginia State Police in Salem, was on duty the afternoon of the shooting. According to Boone, he was supplied with the license number of the vehicle driven by Frye and was asked to obtain information on the number from the Virginia Division of Motor Vehicles (DMV). A DMV computer check showed the license was registered to a

Hampton, Virginia, resident named Rose, for a different car from the one driven by Frye. A computer printout of the report was introduced as Commonwealth's exhibit 5. Shortly thereafter Boone was supplied with the name "Gregory Frye." He entered the name into the National Crime Information Center (NCIC) computer and learned that Frye was wanted for escape from a West Virginia correctional facility. A computer printout of the NCIC report was entered as Commonwealth's exhibit 6.

Frye contends this evidence was inadmissible hearsay, outside the business records exception to the rule against hearsay. We disagree. Recognizing the business records exception, we have admitted into evidence verified regular entries without proof from the original observers or record keepers, generally limiting admission of such evidence to facts or events within the personal knowlege and observation of the recording official. *See Boone* v. *Commonwealth*, 213 Va. 695, 697, 194 S.E.2d 689, 690 (1973). Clearly, the DMV records fall within the scope of this exception. An entry in the DMV records must necessarily be made by the official issuing a license, and such official, if called as a witness, could verify the computerized record from his own personal knowledge.

In certain cases, where verification of the recorded facts is not possible through the personal knowledge of the record keeper, practical necessity nevertheless requires admission of recorded evidence which has a circumstantial guarantee of trustworthiness; this guarantee is provided where evidence shows the regularity of the preparation of the records and reliance on them by their preparers or those for whom they are prepared. *Ashley* v. *Commonwealth*, 220 Va. 705, 707-08, 261 S.E.2d 323, 325 (1980); *Sprinkler Corp.* v. *Coley & Petersen*, 219 Va. 781, 792-93, 250 S.E.2d 765, 773 (1979); *French* v. *Virginian Ry.*, 121 Va. 383, 387-88, 93 S.E. 585, 586 (1917). The NCIC printout, therefore, also comes within the exception. Linda D. Hawkins, administrator of the West Virginia correctional center from which Frye had escaped, testified that a felony warrant was executed July 28, 1984, upon his escape and filed with the NCIC. Furthermore, Boone testified that records of the NCIC are routinely used and relied on by the Virginia State Police in the regular course of business. As to the discrepancy in the license tags, Price had previously testi-

fied that Frye had both Missouri and Virginia tags for the car they were in when Sergeant Biggs was shot.

## C. Jury Instructions.

Under the so-called "triggerman" rule, only the actual perpetrator of a crime delineated in Code § 18.2-31 may be convicted of capital murder and subjected to the penalty of execution, except in the case of murder for hire. *See James Dyral Briley* v. *Commonwealth*, 221 Va. 563, 571-72, 273 S.E.2d 57, 62 (1980); *Johnson* v. *Commonwealth*, 220 Va. 146, 150, 255 S.E.2d 525, 527 (1979). One who is present, aiding and abetting the actual murder, but who does not actually fire the fatal shot, is a principal in the second degree and may be convicted of no greater offense than first-degree murder. *Johnson*, 220 Va. at 150, 255 S.E.2d at 527. Frye contends he was entitled to a first-degree murder instruction on the theory that the jury might find that it was Price, not Frye, who fired the shots that killed the trooper and that Frye was a principal in the second degree.

A defendant is entitled to have the jury instructed only on those theories of the case that are supported by evidence. *Tuggle* v. *Commonwealth*, 228 Va. 493, 508, 323 S.E.2d 539, 548 (1984), *vacated on other grounds*, 471 U.S. 1096, *aff'd on remand*, 230 Va. 99, 334 S.E.2d 838 (1985); *LeVasseur*, 225 Va. at 590-91, 304 S.E.2d at 658-59; *Linwood Earl Briley* v. *Commonwealth*, 221 Va. 532, 543, 273 S.E.2d 48, 55 (1980), *cert. denied*, 451 U.S. 1031 (1981). The evidence to support an instruction "must be more than a scintilla." *LeVasseur*, 225 Va. at 590, 304 S.E.2d at 658; *Hatcher* v. *Commonwealth*, 218 Va. 811, 814, 241 S.E.2d 756, 758 (1978).

Frye contends there was evidence of record to support his theory that he was a principal in the second degree to murder and, thus, to justify a first-degree murder instruction. Asked if he and Frye had ever discussed what would happen if they were stopped by a police officer, Price testified Frye told him that if, for example, they were ever in an automobile accident, " 'well, you are on your own,' and 'I am not going back to prison.' " In addition, Frye testified that as the trooper walked toward the car, Price had the gun in his jacket: "At that time I didn't know what Jim was going to do. I didn't know if he was really going to shoot him or not." After Biggs told him to step out of the car, Frye testified, "I knew

Jim was going to shoot him. . . . I knew he was going to do it. I didn't think he would do it, but I knew he would, kind of."

 This evidence is insufficient to support Frye's theory of first-degree murder. In addition to his presence during commission of the murder, Frye, to be a principal in the second degree, had to commit some overt act, such as inciting, encouraging, advising, or assisting in the murder, or share in Price's criminal intent. *See Moehring* v. *Commonwealth*, 223 Va. 564, 567, 290 S.E.2d 891, 892 (1982). His presence and subsequent flight, without more, were insufficient to make him a principal in the second degree. *Id.* Frye's own account demonstrates that, if Price in fact fired the pistol, Frye committed no overt act in furtherance of the shooting. Furthermore, contrary to his contention on appeal, the quoted testimony concerning their prior discussions, if believed, is not sufficient to imply that Frye shared with Price an intent to shoot any law enforcement officer who might stop them.

The sole issue presented by the evidence in this case was whether it was Frye or Price who killed the trooper. Frye was either guilty or innocent of the capital offense, and he was not entitled to an instruction on first-degree murder. It appears that the trial court incorrectly may have based its refusal of the instruction on the ground that first-degree murder is not a lesser included offense under capital murder. Nevertheless, we will not reverse a trial court's ruling when, as here, the correct result has been reached, although the court may have assigned the wrong reason for its ruling. *See Thims* v. *Commonwealth*, 218 Va. 85, 93, 235 S.E.2d 443, 447 (1977).

Frye assigned error to but did not argue the court's granting of various instructions tendered by the Commonwealth. We have reviewed these instructions, which appear to be correct statements of the applicable law, and find no error by the trial court in giving them to the jury.

Holding that there was no reversible error in the guilt trial, we will affirm Frye's conviction of capital murder.

## IV. THE PENALTY PHASE

In the second phase of the trial, the court sustained a motion by Frye to restrict the evidence, ruling as a matter of law that the killing did not involve torture, depravity of mind, or an aggravated battery to support a finding of vileness. Thus, the penalty issue presented to the jury was whether Frye constituted a continuing

serious threat to society. *See* Code § 19.2-264.2. After hearing the Commonwealth's evidence concerning Frye's criminal history and Frye's evidence in mitigation, the jury returned a verdict fixing Frye's punishment at death, based on his future dangerousness; the trial court entered judgment on the verdict.

For reasons that are hereinafter stated, *infra*, G, we hold that there was reversible error in the penalty phase requiring vacation of the death sentence and remand of the case for a new penalty proceeding. We will rule on questions raised in the penalty phase, however, which may be pertinent upon remand.

### A. Admission of Evidence Resulting from Statement to Armentrout.

In the sentencing proceeding, the Commonwealth sought to introduce testimony of Armentrout concerning statements Frye made to him while they were incarcerated in the Alleghany County jail. Out of the presence of the jury, the court heard Armentrout's account of Frye's planned escape and statements to Armentrout about some of his past criminal activities. Overruling Frye's objections, the court admitted this testimony, testimony of Cale, and physical evidence relating to the alleged plan of escape.

The testimony of Armentrout and Cale showed that Armentrout, a professed Christian, frequently spoke with Frye about his religious beliefs in an effort to convert him to Christianity. In the course of their conversations, Frye asked Armentrout to assist in his escape plan, ultimately writing a note to Armentrout on a dictionary page about securing the necessary tools. Armentrout gave this note to the jailor, who in turn delivered it to Cale. Cale and Armentrout then spoke about Frye's planned escape and his request that Armentrout help him. Cale asked Armentrout to notify Cale "if Frye supplied any additional writings or anything." Accordingly, when Frye gave Armentrout the map depicting the site of the buried money, Armentrout turned this map over to Cale.

Cale said he talked to Armentrout only twice, at their initial discussion, at which he requested any other information Armentrout obtained, and at the time when Armentrout gave him the map. Cale said they never discussed making a deal, but he conceded he told Armentrout he would mention his cooperation to the Commonwealth's attorney.

Armentrout testified that his initial purpose in talking with Frye was his concern for Frye's salvation. He pursued the matter and

helped the Commonwealth in an effort to see that the stolen money was returned. He confirmed Cale's account that he received no promises in return for his aid.

Armentrout stated that he talked with Cale before he told Frye he could have a relative verify the existence of the money and, if it were there, help him in his escape plan. He said that Cale told him, in discussing the escape plan with Frye, to suggest certain information concerning the location and condition of police cars. As time went by, he said he gave Cale "a couple letters" Frye wrote to him in which Frye said that, having done his part, he wanted Armentrout to do his part in assisting his escape.

Citing *Massiah* v. *United States*, 377 U.S. 201 (1964), *United States* v. *Henry*, 447 U.S. 264 (1980), and *Maine* v. *Moulton*, 474 U.S. ____, 106 S.Ct. 477 (1985), Frye contends this evidence was inadmissible because the Commonwealth obtained it by knowingly circumventing his Sixth Amendment right to the assistance of counsel. The Commonwealth argues, however, that the evidence is not tainted, saying Armentrout was not an agent of the Commonwealth because he, not the Commonwealth, initiated the informant relationship, he was not under the Commonwealth's control, and he received no promises in return for his help.

The United States Supreme Court has recently rejected the notion that the Sixth Amendment right to counsel, after the accused is formally charged, adheres only when the government initiates the confrontation between an accused and an informant. *See Moulton*, 474 U.S. at ____, 106 S.Ct. at 486-87. While the Sixth Amendment is not violated when, "by luck or happenstance," the government obtains incriminating statements from a defendant after his right to counsel has attached, the guarantee of this Amendment does extend to "knowing exploitation" by the government of an opportunity to confront the defendant out of the presence of counsel. *Id.* at ____, 106 S.Ct. at 487; *see Henry*, 447 U.S. at 276.

In *Moulton*, however, the Court limited its holding in one crucial respect. The proscription against knowing circumvention of the right of the accused to have counsel present in any confrontation between himself and a government agent extends only to *pending charges* concerning which the right of counsel has attached. The legitimate public interest in thorough investigation of other criminal activities requires that the exclusionary effect of this rule not be extended to evidence of crimes not yet charged but obtained in surveillance of a defendant. Thus, only such state-

ments as incriminate the defendant on the pending charges are obtained in violation of the Sixth Amendment and must be excluded. 474 U.S. at _____, 106 S.Ct. at 489.

■ On the facts of the present case, any evidence obtained through the initial conversations of Armentrout and Frye was admissible because the police obtained such evidence by the fortuity of Armentrout's presence and his voluntary decision to bring the information he had learned to the attention of the police. However, once Cale knew that Frye would make statements he had a constitutional right not to make to a concealed agent of the police, as Armentrout became, continued use of Armentrout as an informant denied Frye his right to assistance of counsel and precluded use of any incriminating statements pertaining to the charge of capital murder. No such evidence, however, if elicited, was offered or used at trial. The only evidence resulting from Frye's statements to Armentrout introduced at trial was evidence of past and future planned criminal activity unrelated to the offense for which he was on trial. Such use of this evidence did not violate the Sixth Amendment.

### B. Relevance of Evidence of Dangerousness.

■ Frye contends the evidence of his purported escape plan was inadmissible under Code § 19.2-264.2, which confines consideration to his "past criminal record of convictions." This argument, however, overlooks other statutory language and our prior rulings. Under Code § 19.2-264.4(C), the Commonwealth is authorized to establish a defendant's future dangerousness by "evidence of the prior history of the defendant." We have repeatedly held that admissible evidence in the sentencing phase is not limited to the defendant's record of convictions. *See Watkins*, 229 Va. at 487, 331 S.E.2d at 436; *Edmonds* v. *Commonwealth*, 229 Va. 303, 312, 329 S.E.2d 807, 813, *cert. denied*, 474 U.S. _____, 106 S.Ct. 339 (1985); *LeVasseur*, 225 Va. at 593-94, 304 S.E.2d at 660; *Peterson* v. *Commonwealth*, 225 Va. 289, 298, 302 S.E.2d 520, 526, *cert. denied*, 464 U.S. 865 (1983); *Quintana* v. *Commonwealth*, 224 Va. 127, 146-47, 295 S.E.2d 643, 653 (1982), *cert. denied*, 460 U.S. 1029 (1983); *Stamper* v. *Commonwealth*, 220 Va. 260, 275-77, 257 S.E.2d 808, 819-20 (1979), *cert. denied*, 445 U.S. 972 (1980). Adhering to these rulings, we hold that evidence of a defendant's plan to escape is relevant and admissible to show his future dangerousness.

■ Frye also contends that evidence of his confession to Investigator Cale and his demeanor during this statement were irrelevant and should not have been admitted. We disagree. The circumstances of the crime and the defendant's lack of remorse are proper factors to be considered on the issue of the probability that he will constitute a continuing serious threat to society. *See* Code § 19.2-264.4 (evidence of "circumstances surrounding the commission of the offense" is admissible to show dangerousness); *Giarratano* v. *Commonwealth*, 220 Va. 1064, 1074-75, 266 S.E.2d 94, 100 (1980) (evidence may include circumstances of offense); *Clark* v. *Commonwealth*, 220 Va. 201, 210-11, 257 S.E.2d 784, 790 (1979), *cert. denied*, 444 U.S. 1049 (1980) (jury may consider lack of remorse). Moreover, in his statement to Cale, Frye asserted that he had perpetrated about 3,000 acts of breaking and entering. This evidence also was relevant to the question of his future dangerousness.

### C. Limitation of Argument of Defense Counsel.

Defense counsel argued that, in determining the proper penalty to impose, the jury should consider the finality of the death sentence and the possibility that additional evidence might later demonstrate Frye's innocence of the crime for which it had convicted him. Defense counsel pointed out that certain questions remained unanswered, specifically noting the inconclusiveness of the gunpowder residue analysis. Counsel repeatedly argued to the jury that its guilty verdict was wrong, that the Commonwealth had failed to prove its case against Frye. Although the trial court properly sustained the Commonwealth's objection to this argument, no cautionary instruction was given at that time and defense counsel later resumed his argument that Frye was not guilty and the truth would eventually be known.

■ The trial court did not abuse its discretion in directing defense counsel to cease such improper argument and ultimately in cautioning the jury to disregard it. Indeed, the trial court would have been remiss if it had permitted defense counsel to persist in violating with impunity the court's admonition. The issue of guilt

had been resolved in the first phase of the trial and could not properly be raised again in the penalty phase.

### D. Failure to Instruct on Mercy.

 Frye also contends the court erroneously refused to allow the jury to consider pity, sympathy, and mercy, refusing an instruction allowing consideration of these factors. The court allowed defense counsel to argue to the jury that it could consider mercy in deciding Frye's penalty. Having instructed the jury that it could sentence Frye to life imprisonment or to death, it was unnecessary for the court to instruct on mercy, mercy or compassion being implicitly a part of any decision on the issue of life or death.

### E. Failure to Instruct on Unanimity Requirement.

 Frye contends the court erroneously refused a proposed instruction stating that the jury must be unanimous in finding the existence of an aggravating factor. At the conclusion of oral argument, however, the court in fact instructed the jury that its verdict must be unanimous. The jury's form verdict stated that both the finding of dangerousness and the sentencing to death were unanimous. Furthermore, a poll reflected the unanimity of the jury. Clearly, the verdict was unanimous in all respects, and the court's refusal of Frye's proposed instruction did not constitute reversible error.

### F. Comment on Armentrout's Testimony.

 The assistant Commonwealth's attorney stated in closing argument that Armentrout's testimony "was absolutely and totally uncontradicted by anyone." Frye complains that this remark constituted an impermissible comment on his failure to testify. Where a remark is challenged as a comment on the defendant's failure to testify, the test of its propriety is "whether, in the circumstances of the particular case, 'the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'" *Hines* v. *Commonwealth*, 217 Va. 905, 907, 234 S.E.2d 262, 263 (1977) (citations omitted). Here, the assistant Commonwealth's attorney's comment was made in the course of his argument on the credibility of the Commonwealth's witness, Armentrout. Armentrout's credibility was the subject of conflict in

the evidence, and the prosecutor could properly tell the jury, as a reason for believing his testimony, that his account was uncontradicted. *See Washington* v. *Commonwealth*, 216 Va. 185, 195, 217, S.E.2d 815, 824 (1975).

### G. Comment on Responsibility for Sentence of Death.

Defense counsel engaged in an emotional closing argument, repeatedly telling the jury that it was being asked to "kill this boy." In an effort to diminish the impact of these remarks, the assistant Commonwealth's attorney informed the jury:

> Well, ladies and gentlemen of the jury, that load is not on your shoulders, that responsibility is not yours. The Judge will be the person that fixes sentence if you find the defendant guilty as charged and fix his punishment at death. The Court will pronounce sentence.

Upon objection by defense counsel, the court ruled, in the jury's presence, "[I]t is clearly the law. The jury verdict is a recommendation." Frye contends the prosecutor's argument and the court's comment constituted clear error requiring reversal under *Caldwell* v. *Mississippi*, 472 U.S. 320 (1985), decided June 11, 1985, three days after the conclusion of Frye's trial but before entry of the final judgment order on July 3, 1985.

*Caldwell* also involved allegedly improper argument by a prosecutor in a capital sentencing proceeding. In that case, the prosecutor sought to dilute the effect of defense argument that the prosecutor said would have the jurors believe that they would "kill this man." He told the jury, "Your job is reviewable." Overruling a defense objection, the trial court said, "I think it proper that the jury realizes that it is reviewable automatically as the death penalty commands." Accordingly, the prosecutor reiterated to the jury, "as Judge Baker has told you, . . . the decision you render is automatically reviewable by the Supreme Court." *Id.* at 325-26.

The United States Supreme Court held that this effort to minimize the jury's sense of responsibility for imposing a sentence of death violated "the Eighth Amendment's heightened 'need for reliability in the determination that death is the appropriate punishment in a specific case.' " *Id.* at 323 (quoting *Woodson* v. *North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion)). Casting its holding in broad language, the court stated that "it is constitutionally impermissible to rest a death sentence on a determination

made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Id.* at 328-329.

Justice Marshall, writing for a majority of five,[5] found that unreliability and bias inhere in death sentences following "state-induced suggestions that the sentencing jury may shift its sense of responsibility to an appellate court." *Id.* at 330. This bias stems from several sources. First, there are institutional limits on appellate review that may not be understood by jurors. Second, a jury, understanding a sentence of death will receive automatic review, may impose this penalty "to 'send a message' of extreme disapproval for the defendant's acts" *Id.* at 331 where it otherwise might not have found the death sentence appropriate. Third, correctly assuming that the lesser sentence does not receive mandatory review, a jury may impose the death sentence to trigger automatic review and delegate the sentencing responsibility to another tribunal. And, finally, realizing that review would be conducted by others, the jury might minimize the significance of its own role and accept the invitation to shift the sentencing responsibility to another body, particularly where it is told such review is by judges who the jury may believe, because they are legal authorities, are more entitled to make the penalty determination. *Id.* at 333.

---

[5] One section of Justice Marshall's opinion speaks for only a plurality of the Court, as Justice O'Connor wrote separately to express her view of the application of *California* v. *Ramos*, 463 U.S. 992 (1983). While the plurality found information concerning appellate review to be "wholly irrelevant to the determination of the appropriate sentence," 472 U.S. at 342, Justice O'Connor interpreted *Ramos* to allow "accurate instructions regarding post-sentencing procedures." *Id.* (concurring opinion). Nonetheless, she found the prosecutor's comments gave a "misleading picture of the jury's role" because they did not accurately instruct the jury on the limited nature of appellate review of a sentence of death. *Id.* at 342.

Any contention that the *Caldwell* decision has no precedential effect, being only a plurality opinion, is meritless in view of the Supreme Court's subsequent action. In *Tucker* v. *Kemp*, 474 U.S. ___, 106 S.Ct. 517 (1985), *Rogers* v. *Ohio*, 474 U.S. ___, 106 S.Ct. 518 (1985), and *Booker* v. *Mississippi*, 472 U.S. ___, 105 S.Ct. 3493 (1985), the Court vacated death sentences and remanded the cases for further consideration in view of *Caldwell*. In each case, the action was without dissent.

Certiorari was denied, however, in two cases decided by lower courts before *Caldwell*. See *State* v. *South*, 331 S.E.2d 775 (S.C. 1985), *cert. denied*, 474 U.S. ___, 106 S.Ct. 209 (1985) (prosecutor told jury there are "safeguards" that the law does not allow him to mention); *State* v. *Busby*, 464 So. 2d 262 (La. 1985), *cert. denied*, 474 U.S. ___, 106 S. Ct. 196 (1985) (prosecutor incorrectly told jury that its verdict was only a recommendation, but the petition, filed before *Caldwell* was decided, failed to raise the *Caldwell* issue).

■ We believe the ruling of *Caldwell* applies to the present case. The Commonwealth urges that application of *Caldwell* should be narrowly limited to comments about appellate review. This argument, however, ignores the sweeping language of the Court, prohibiting any argument which leads a jury to believe the sentencing responsibility lies "elsewhere."[6]

Under Virginia's statutory capital sentencing scheme, it is the jury's responsibility to "fix" the punishment of a defendant who has been convicted of a capital offense and it is the court's responsibility to impose sentence. *See* Code §§ 19.2-264.3, -264.4, -264.5. Although the sentencing statute twice refers to the jury's verdict as a recommendation, *see* Code §§ 19.2-264.2(2), -264.4(A), the court must either impose sentence in accordance with the verdict fixing punishment at death or "set aside the sentence of death" and impose the lesser penalty of imprisonment for life. *See* Code § 19.2-264.5. The court may not arbitrarily take this latter action, being authorized to set aside the death sentence only after consideration of a probation officer's report and "upon good cause shown." *Id.* Therefore, the jury's verdict is not merely a recommendation to be followed or rejected by the trial court at its discretion. In view of the statutory language, it is understandable that the prosecutor and the trial court inadvertently stated the law in a manner that could have misled the jury.

In criminal actions in the Commonwealth, the power to determine punishment of one convicted of a criminal offense rests in the jury (or the court in cases tried without a jury). Code § 19.2-295. The jury's role has long been construed to be more than advisory, resulting in more than just a recommendation of punishment. *See Ballard* v. *Commonwealth*, 228 Va. 213, 215, 321 S.E.2d 284, 285 (1984) (sentence in criminal prosecution of an adult is "fixed" by jury); *Smyth* v. *Bunch*, 202 Va. 126, 130-31, 116 S.E.2d 33, 37 (1960), *cert. denied*, 364 U.S. 935 (1961) (use of word "recommend" by a jury in its verdict was merely an irreg-

---

[6] Two other states have addressed the question whether the *Caldwell* rule embraces references to the jury's verdict as a recommendation. In *People* v. *Perez*, 108 Ill. 2d 70, 90-91, 483 N.E.2d 250, 260 (1985), the court held *Caldwell* did not require vacating a sentence of death where brief inaccurate remarks were corrected by the trial court and it was apparent the jury's understanding of its sentencing responsibility was not confused. In *Matthews* v. *Kentucky*, 709 S.W.2d 414, 421 (Ky. 1985), the court found a challenged jury instruction to be an accurate statement of the role of a jury in that state in sentencing a capital defendant.

ularity since jury is authorized to "fix" punishment in criminal cases); *cf.* Code § 8.01-430 (trial judge's discretion is limited in setting aside jury verdict in civil action); *Dutton* v. *Locker*, 224 Va. 535, 543-44, 297 S.E.2d 814, 819 (1982) (the trial judge may not substitute own conclusion for that of jury in civil action where jury verdict is based on credible evidence); *Lane* v. *Scott*, 220 Va. 578, 581-82, 260 S.E.2d 238, 240 (1979), *cert. denied*, 446 U.S. 986 (1980) (same). Furthermore, we have held that it is improper for a prosecutor to tell the jury that, if it makes a mistake, the court can correct it. *See Lyons* v. *Commonwealth*, 204 Va. 375, 379, 131 S.E.2d 407, 409-10 (1963).

Thus, under Virginia law or under the rule announced in *Caldwell*, it is improper for the jury to be told that the trial judge shares the responsibility for the death sentence. Like the reference to appellate review in *Caldwell*, such a comment is misleading because it fails to place before the jury accurate information explaining the limits on the court's power to set aside the jury's verdict. While it is true that the trial court in a proper case may set aside a sentence of death, the court does not have unlimited discretion to do so in any case.

The Commonwealth asserts that, when viewed in the context of the prosecutor's entire argument and the proceedings throughout the trial, the challenged remarks could not have had an appreciable effect in minimizing the jury's sense of responsibility. But the *Caldwell* decision squarely rejects the same argument raised by the dissenters in that case, holding that other remarks to the effect that the jury was responsible for sentencing did not cure the prejudicial effect of the prosecutor's improper argument. *See* 472 U.S. at 340 n.7 (majority opinion); *id.* at 343 (concurring opinion). Here, as in *Caldwell*, in spite of other argument emphasizing the importance of the jury's function, the prosecutor did not retract the questionable argument. Here, as in *Caldwell*, the trial court failed to correct the prosecutor's comments, approving the misleading statement of the law and reinforcing its potentially damaging effect. Because we cannot say that the assistant Commonwealth's attorney's remarks had "no effect" on the jury's sentencing decision, *id.* at 341, we hold that the sentence of death must be vacated and the case remanded for further proceedings only on the issue of penalty. *See* Code § 19.2-264.3(C).

## V. SENTENCE REVIEW

In view of our ruling that the sentence of death must be vacated on other grounds, we will not conduct the sentence review provided in Code § 17-110.1 to determine whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factors or whether the sentence is excessive or disproportionate to the sentences imposed in similar cases.

## VI. INEFFECTIVE ASSISTANCE OF COUNSEL

Pursuant to Code § 19.2-317.1,[7] effective July 1, 1985, the issue of ineffective assistance of counsel in a criminal proceeding is now a proper subject for review on direct appeal. Accordingly, trial counsel moved to have new counsel substituted to represent Frye on appeal in order that the issue of effectiveness might properly be presented. The trial court denied counsel's motion but appointed independent counsel to review the record and determine if a claim of ineffectiveness should be raised in Frye's direct appeal. Frye contends his continued representation by counsel whose effectiveness in the trial below is an issue on appeal deprives him of the effective assistance of counsel in the appeal of the other issues in the case.

The court implicitly acknowledged that it could not require trial counsel to argue the issue of his own ineffectiveness and properly appointed separate counsel to address the issue. We conclude, however, that the trial court did not err in allowing trial counsel to prosecute the remainder of the appeal. Such a determination was within the trial court's discretion. Although, in certain cases, it may be proper or even advisable for the trial court to appoint new counsel to handle the entire appeal, it is not imprudent for a court, in a case of such complexity as this, to allow trial counsel, because of his prior involvement and familiarity with the evidence and issues of the case, to continue representing the defendant on appeal of issues other than ineffective representation of counsel. We find no abuse of discretion in the court's ruling.

Frye, through independent counsel, attacks the effectiveness of his representation by trial counsel in two respects. He challenges trial counsel's failure to present evidence in support of a pretrial

---

[7] *Code § 19.2-317.1. Ineffective assistance of counsel.* — A claim of ineffective assistance of counsel may be raised on direct appeal if assigned as error and if all matters relating to such issue are fully contained within the record of the trial.

motion for a change of venue. He also argues that, through cross-examination of Price and direct examination of Frye, counsel elicited prejudicial evidence of Frye's past criminal conduct which would not otherwise have been revealed to the jury in the guilt phase of the trial.

The Commonwealth urges that these claims of ineffectiveness are not cognizable under Code § 19.2-317.1 because the trial record is inadequate to permit a fair resolution of the issues. We agree.

The Sixth Amendment's guarantee of assistance of counsel requires that counsel exercise such care and skill as a reasonably competent attorney would exercise for similar services under the circumstances. *Stokes* v. *Warden*, 226 Va. 111, 116-17, 306 S.E.2d 882, 884 (1983); *see McMann* v. *Richardson*, 397 U.S. 759, 770-71 (1970). The burden, however, rests upon one challenging counsel's performance to show that it fell below the standard of reasonableness. *Strickland* v. *Washington*, 466 U.S. 668, 689 (1984). The convicted defendant must overcome a strong presumption that counsel's actions were based upon sound trial strategy: "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*

We reject Frye's contention that such a "fair assessment" may be made upon the record before us. In view of the seriousness of a charge of ineffective assistance, counsel is entitled to the opportunity to state his reasons for his acts of commission and omission now subjected to challenge. On the other hand, we will not rule as a matter of law, upon this record, that counsel's conduct was consistent with reasonable trial strategy and therefore was not ineffective. We will not impute to counsel a certain rationale and thereby deny the defendant the opportunity to demonstrate, by evidence which might be obtained in a plenary hearing, that counsel had no such tactical basis for his actions.

Holding that the trial record does not fully contain all matters relating to the issue of ineffective representation of counsel, we do not reach the merits of this aspect of Frye's appeal.

## VII. CONCLUSION

For the reasons assigned, we will affirm Frye's conviction of capital murder, but we will vacate the death sentence and remand the case for new proceedings to determine the appropriate penalty (Record No. 850793) and we will affirm Frye's conviction of use of a firearm in the commission of a felony (Record No. 850794).

Record No. 850793 — *Affirmed in part; reversed in part; sentence vacated; and case remanded.*

Record No. 850794 — *Affirmed.*