STATE OF NORTH CAROLINA v. DONTE DORRELL SNEED, DEFENDANT

No. COA10-189

(Filed: 5 April 2011)

**Evidence—prior crimes or bad acts—reported stolen gun possessed by defendant**

> The trial court did not err in a robbery with a dangerous weapon, possession of stolen property, and misdemeanor fleeing to elude arrest with a motor vehicle case by admitting under N.C.G.S. § 8C-1, Rule 803(6) testimony that the National Crime Information database indicated a gun with the same serial number as the one possessed by defendant had been reported stolen in Florida. Even assuming *arguendo* that the remaining evidence challenged on appeal should have been excluded, defendant failed to demonstrate plain error.

Appeal by defendant from judgments entered 28 May 2009 by Judge Ripley E. Rand in Wake County Superior Court. Heard in the Court of Appeals 1 September 2010.

*Attorney General Roy Cooper, by Assistant Attorney General Linda Kimbell, for the State.*

*Paul Y. K. Castle for defendant-appellant.*

GEER, Judge.

Defendant Donte Dorrell Sneed appeals from his convictions of robbery with a dangerous weapon, possession of stolen property (a handgun), and misdemeanor fleeing to elude arrest with a motor vehicle. Defendant primarily argues that the trial court should have excluded as inadmissible hearsay several pieces of evidence indicating that the handgun had been stolen in South Miami, Florida. We hold that the trial court properly admitted, under Rule 803(6) of the Rules of Evidence, testimony that the National Crime Information Center ("NCIC") database indicated a gun with the same serial number as the one possessed by defendant had been reported stolen in South Miami, Florida. We further hold that even assuming, without deciding, that the remaining evidence challenged on appeal should have been excluded, defendant has failed to demonstrate plain error—that the jury would probably have reached a different verdict in the absence of the evidence.

STATE v. SNEED

[210 N.C. App. 622 (2011)]

Facts

The State's evidence tended to show the following facts. On 16 July 2008, William Gonzalez drove his light blue 1998 Nissan Sentra to an Exxon gas station on Atlantic Avenue in Raleigh, North Carolina. Mr. Gonzalez noticed defendant standing, in his words, "suspiciously" near the store entrance, watching him. According to the store manager, defendant had arrived at the store approximately five minutes before Mr. Gonzalez. When Mr. Gonzalez entered the store to prepay for his gas, defendant also entered the store. Mr. Gonzalez noticed that defendant was watching as Mr. Gonzalez opened his wallet, which contained approximately 400 U.S. dollars and 50 Mexican pesos.

After Mr. Gonzalez paid for his gas and returned to his car, defendant left the store. When Mr. Gonzalez finished pumping the gas and got into his car, defendant opened the passenger door, brandished a handgun, climbed into the car, and directed Mr. Gonzalez to drive. Mr. Gonzalez testified that he had never met defendant before that day.

While defendant pointed the gun at Mr. Gonzalez' stomach, even touching his rib cage with the gun, Mr. Gonzalez began driving down Millbrook Avenue. Mr. Gonzalez turned right on a familiar street and stopped the car suddenly in an attempt to cause defendant to drop his gun.

Defendant then ordered Mr. Gonzalez to hand over his wallet, which Mr. Gonzalez did. While pulling out his wallet, Mr. Gonzalez noticed defendant sweating. Because Mr. Gonzalez began to worry that defendant would actually hurt him, Mr. Gonzalez attempted to grab the gun, and the two men struggled. The gun fired, hitting the windshield.

Mr. Gonzalez was able to get out of the car and run towards a nearby veterinary clinic. Defendant then drove away in Mr. Gonzalez' car. Mr. Gonzalez hailed a taxi and unsuccessfully attempted to follow defendant. The taxi drove him home where Mr. Gonzalez called the police, reporting the incident and the vehicle tag number.

Later that day, Raleigh police officers went to the Exxon gas station and questioned Mr. Boone, the store manager working during the carjacking. Mr. Boone reviewed the surveillance video with the police officers. Police were able to reproduce photos from the surveillance video to assist with the investigation. These photos were used in a "bolo" or "be on the lookout for" e-mail distributed to all sworn personnel on 17 July 2008. The "bolo" included a photograph

of a vehicle similar to Mr. Gonzalez' car and a photo of defendant derived from the surveillance video.

On 18 July 2008, Raleigh Police Detective Goodwin notified Detective Rhodes that he had identified the person in the "bolo" as defendant. Detective Rhodes researched defendant's name in a police database and was able to obtain another photograph from the City County Bureau of Identification. Detective Rhodes used defendant's photo and photos of five other individuals to create a photographic lineup that another officer then presented to Mr. Gonzalez. Mr. Gonzalez was not, however, able to identify defendant in the photographic array.

On 26 July 2008, at approximately 9:45 a.m., Sergeant Rosa noticed a vehicle similar to Mr. Gonzalez' car in a driveway. The vehicle was the same make and model although a different color. Sergeant Rosa ran the license tags, which came back as registered to Mr. Gonzalez. Sergeant Rosa called for backup to conduct surveillance of the vehicle.

After several hours of surveillance, Sergeant Rosa and several of his officers were admitted into the home where the vehicle was parked. The home was being used as a boarding house where each bedroom was a separate residence. The officers went door to door, talking with the residents who were home and performing a security check of their rooms to ensure no one was hiding inside.

As a result of these interviews, the officers learned that Dorothy Moore owned the home. They asked Ms. Moore to come to the house to help with the investigation. The officers told her they were investigating a carjacking and asked if she had seen a light blue Nissan. She informed them that defendant lived in the house and that she had seen him driving a vehicle matching that description for the past 10 days.

Ms. Moore reported that defendant had parked the Sentra on the septic tank behind the house even after she instructed him not to do so. She had noticed a bullet hole in the windshield. When she asked defendant about the bullet hole, he told her the vehicle belonged to one of his girlfriends, and he did not know why there was a bullet hole in the windshield. The officers then determined that the tags from Mr. Gonzalez' vehicle had been switched with those of the Sentra in the front driveway. The owner of that Sentra also lived in the house; he did not know of the switch.

After interviewing Ms. Moore, the officers knocked on defendant's door, but received no answer. Ms. Moore gave them a key to the

room so that the officers could determine if anyone was inside. The officers found no one in the room, so they secured the room and guarded the door.

On 26 July 2008, at approximately 4:00 or 5:00 p.m., Officer Kellogg responded to a call about a light blue Nissan Sentra with a bullet hole in the windshield parked in a parking lot on Woodbend Drive. He was instructed to block the vehicle in the event defendant tried to leave the parking lot. While conducting a search of the area, the surveillance officers observed defendant walking toward the vehicle. Defendant returned to the car, and Officer Kellogg was unable to reach the parking lot in time to block defendant's exit. As defendant drove towards him, Officer Kellogg turned on his police lights. Defendant swerved to the right to avoid hitting Officer Kellogg and drove toward Six Forks Road.

Another officer in an unmarked vehicle moved in between defendant and Officer Kellogg. Then, Officer Mercer, a canine officer, who had been called to assist in locating defendant on foot, positioned his marked car for safety reasons between defendant and the unmarked police vehicle. Defendant nearly collided with several cars during the pursuit, forcing those vehicles to use evasive measures to avoid a collision. Officers Mercer and Kellogg testified that defendant was driving at approximately 60 to 80 miles per hour in a 45-mile-per-hour zone.

Defendant turned into a cul-de-sac, slammed on his brakes, and got out of the car. Officer Mercer and his dog pursued defendant on foot. Officer Mercer ordered defendant to halt, warning defendant he would release his dog. When defendant continued to run, Officer Mercer let his dog loose. While attempting to evade the dog, defendant slipped and fell to the ground. The dog then latched onto defendant's left leg.

Officer Mercer approached defendant with his weapon drawn and instructed defendant to turn onto his stomach and stretch out his arms. Instead of complying, defendant kicked at the dog, which was still holding onto his leg. Officer Mercer hostered his weapon and attempted to grab defendant's wrists. Defendant stood up, facing away from Officer Mercer, who then attempted to use his Taser on defendant. Before he could remove the Taser from its holster, defendant turned to face Officer Mercer, assuming a fighting position. Defendant reached toward his waistband with his right hand, leading Officer Mercer to believe defendant was reaching for a weapon.

Officer Mercer drew his pistol again and pointed it at defendant, ordering him to lie down and show his hands. Defendant did not

respond to this command and continued reaching toward his waist. Even after Sergeant Quick arrived and defendant was tackled to the ground, defendant continued to reach toward his waistband. Officer Mercer warned defendant not to pull his hands out from under his body or he would be shot. Officer Mercer, while holding defendant's wrist, felt a pistol in defendant's hand. Defendant finally relinquished control of the gun he was holding and began to pull his arm from underneath his body. Officer Mercer took control of the loaded weapon.

Defendant was handcuffed and placed in custody. Once in custody, an EMS crew looked at defendant's wounds from the dog and offered to transport him for treatment. When defendant refused to talk, the EMS crew bandaged him up, and the officers transported him to the police station for questioning.

The magazine clip was removed from defendant's gun, which was a nine millimeter handgun, and the gun was then turned over to Detective Rhodes, the lead detective in the case. Sergeant McLeod arrived on the scene and retrieved the items taken from defendant, including the gun, magazine clip, several rounds of ammunition, and a black backpack that contained clothing and various documents with the defendant's name on them. The gun was subsequently determined to have been stolen in South Miami, Florida.

The same day, Detective Rhodes searched defendant's residence pursuant to a search warrant. The search located 13 loose nine millimeter bullets, 30 unfired Remington nine millimeter bullets in the dresser, a pair of khaki shorts similar to those worn by the suspect in the surveillance video, a black backpack with a red design on the back of it, a black mask, and documentation bearing defendant's name.

Several days later, Ms. McBride, who lived on the same street as defendant, was out walking when she and her dog came upon a wallet. Ms. McBride called the police regarding the wallet. The police recovered the wallet, which turned out to belong to Mr. Gonzalez.

On 2 September 2008, defendant was indicted for (1) assault with a deadly weapon on a law enforcement officer, (2) robbery with a dangerous weapon, (3) possession of stolen property, (4) possession of a stolen motor vehicle, and (5) felonious speeding to elude arrest. At trial, defendant testified that his mother and siblings currently lived in Miami, Florida and that he had previously lived there himself. He had been in North Carolina for about two years as of the date of the trial, and Mr. Gonzalez had been a regular drug customer of his.

His explanation of the events leading up to his arrest are as follows. He testified that on 16 July 2008, he met Mr. Gonzalez at the Exxon station on Atlantic Avenue and Millbrook Road to complete a drug transaction. Defendant testified that he followed Mr. Gonzalez into the store, but acted like he did not know Mr. Gonzalez. As was their usual arrangement, Mr. Gonzalez, as partial payment for the drugs, would allow defendant to use his car. They drove away from the gas station and stopped nearby to complete the trade. Defendant testified that his gun was in his closet at home and that he did not have any gun with him on 16 July 2008. Mr. Gonzalez left the car and instructed defendant on when to return his vehicle later that same day.

Defendant testified that he did not return the vehicle on time because he loaned it to another friend who, in turn, did not return it to defendant on time. According to defendant, Mr. Gonzalez became furious after repeatedly calling defendant about the car and defendant's not answering the calls. Although the vehicle was returned to defendant the next day, defendant did not return the vehicle to Mr. Gonzalez. Defendant claimed that, during the car chase, he was driving approximately 35 miles per hour.

At the close of the evidence, the trial court allowed defendant's motion to dismiss the charge of assault with a deadly weapon on a law enforcement officer. The trial court instead charged the jury on the offense of attempted assault with a deadly weapon on a law enforcement officer, as well as on the other offenses with which defendant was charged.

The jury found defendant not guilty of attempted assault with a deadly weapon on a law enforcement officer, but found him guilty of (1) robbery with a dangerous weapon, (2) possession of stolen property, (3) possession of a stolen motor vehicle, and (4) misdemeanor fleeing to elude arrest with a motor vehicle. The trial court arrested judgment on the possession of a stolen motor vehicle charge. The court sentenced defendant to a presumptive-range term of 77 to 102 months imprisonment for the robbery with a dangerous weapon conviction and a consecutive presumptive-range term of eight to 10 months for the possession of stolen property and misdemeanor fleeing to elude arrest with motor vehicle convictions. Defendant timely appealed to this Court.

## Discussion

On appeal, defendant challenges only the trial court's admission of evidence relating to whether the gun in defendant's possession was

stolen, including testimony regarding statements in a computer print-out from the NCIC database identifying the gun as stolen, evidence relating to a South Miami Police Report regarding the theft of the gun, and testimony of a telephone conversation between Detective McLeod and Detective Lopez of the South Miami Police Department regarding the stolen gun. Because defendant did not object to the admission of any of this evidence at trial, he now argues its admission was plain error.

It is well settled that plain error

> "is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a *fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done, or where [the error] is grave error which amounts to a denial of a fundamental right of the accused, or the error has resulted in a miscarriage of justice or in the denial to appellant of a fair trial or where the error is such as to seriously affect the fairness, integrity or public reputation of judicial proceedings or where it can be fairly said the instructional mistake had a probable impact on the jury's finding that the defendant was guilty."

*State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting *United States v. McCaskill*, 676 F.2d 995, 1002 (4th Cir.), *cert. denied*, 459 U.S. 1018, 74 L. Ed. 2d 513, 103 S. Ct. 381 (1982)).[1]

I

With respect to the NCIC database testimony, Detective Rhodes testified that he was notified shortly after he arrived at the arrest scene that the handgun recovered from defendant's person had been checked against the NCIC database using its serial number and that the gun was listed as having been stolen in South Miami, Florida. He verified this information himself by using the serial number on the handgun to run his own search in the NCIC database with the same

---

1. With respect to the police report, defendant also argues that its admission violated his right to confrontation under the United States and North Carolina Constitutions. Defendant did not make this constitutional argument below. Although defendant argues that the State must prove that any error in admitting this report was harmless beyond a reasonable doubt, because defendant did not object on confrontation grounds at trial, our standard of review is plain error. *State v. Lemons*, 352 N.C. 87, 96, 530 S.E.2d 542, 547-48 (2000), *cert. denied*, 531 U.S. 1091, 148 L. Ed. 2d 698, 121 S. Ct. 813 (2001).

results—the NCIC database identified the gun as stolen in South Miami, Florida.

The State does not dispute that the information from the NCIC database constituted hearsay. The State argues, however, that the NCIC database falls within the hearsay exception set out in Rule 803(6) of the Rules of Evidence for records of regularly conducted business activity. Rule 803(6) defines such records as including:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, *all as shown by the testimony of the custodian or other qualified witness*, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

(Emphasis added.)

The information in the NCIC database is a "database compilation, in any form" falling within Rule 803(6). Detective Rhodes testified that the NCIC database is a "database that's used nationwide that law enforcement agencies contact and enter items such as handguns, vehicles, license plates, different articles that have serial numbers on them that can be traced." Defendant does not dispute that information from the NCIC database could fall within the scope of Rule 803(6), but argues that the State failed to lay the necessary foundation for admission of the NCIC database evidence under that rule.

Defendant contends that the State was required to present testimony from a custodian of records for NCIC that (1) the information was regularly kept in the course of NCIC's business and (2) NCIC routinely makes such records in the course of conducting its business. According to defendant, Detective Rhodes, a detective with the Raleigh Police Department, was not qualified to testify that the requirements of Rule 803(6) were satisfied.

This Court addressed a similar issue in *State v. Windley*, 173 N.C. App. 187, 617 S.E.2d 682 (2005), *disc. review denied*, 360 N.C. 295, 629 S.E.2d 288, *cert. dismissed*, 360 N.C. 295, 629 S.E.2d 290 (2006).

In *Windley*, an officer with the Forsyth County Sheriff's Department testified as an expert in the field of latent fingerprint lifting and fingerprint identification. *Id.* at 193, 617 S.E.2d at 686. This Court described his testimony as follows:

> [The officer] testified he obtained several latent fingerprints at the Kernersville residence crime scene and compared them to fingerprints contained in a computer system database known as "AFIS" or "Automated Fingerprint Identification System." [The officer] stated [that] AFIS consists "of a known database of fingerprints of criminal arrest cards of people [who've] been arrested in the state." Using the database, [the officer] received a reference to defendant. [The officer] then compared one of the latent fingerprints he obtained at the crime scene to the actual fingerprint card containing defendant's fingerprints. [The officer] testified that such fingerprint cards were kept in the normal course of business in the police record files. According to [the officer], the fingerprint obtained from the door of the Kernersville residence matched the fingerprint card containing defendant's fingerprints.

*Id.* Although the defendant objected to the admission of the fingerprint card as a violation of his right to confrontation, the trial court concluded that it was admissible as a business record under Rule 803(6). *Windley*, 173 N.C. App. at 193-94, 617 S.E.2d at 686.

On appeal, this Court first pointed out that business records do not constitute testimonial evidence and, therefore, their admission does not violate confrontation rights. *Id.* at 194, 617 S.E.2d at 686. The Court then "conclude[d] the fingerprint card created upon defendant's arrest *and contained in the AFIS database* was a business record and therefore nontestimonial." *Id.* (emphasis added).

In this case, Detective Rhodes gave testimony regarding the NCIC database comparable to that of the officer in *Windley* regarding the AFIS database. Detective Rhodes described the NCIC database as entries from law enforcement officers used by law enforcement to trace stolen property. Detective Rhodes stated that he ran the serial number of the gun through the NCIC database and found that the gun with that serial number had been reported stolen. While Detective Rhodes did not explicitly state that the records were kept in the ordinary course of business, defendant does not dispute that the testimony of Detective Rhodes, if he were a qualified witness, was adequate to support that inference. Under *Windley*, Detective

Rhodes, who used the NCIC database in his regular course of business, was sufficiently qualified to lay the necessary foundation for admission of the NCIC information under Rule 803(6).

While our appellate courts have not previously specifically ruled on whether information obtained from the NCIC database falls under the business record exception to the hearsay rule, the Virginia Court of Appeals addressed the issue in *Cooper v. Commonwealth*, 54 Va. App. 558, 680 S.E.2d 361 (2009). In *Cooper*, when the Commonwealth attempted to present an NCIC report showing that a shotgun recovered from the defendant was reported stolen, the defendant objected on hearsay grounds. *Id.* at 564, 680 S.E.2d at 364. An officer testified that he reported the serial number on the gun to a dispatcher, who confirmed that the NCIC database indicated the gun had been stolen. *Id.* at 568, 680 S.E.2d at 366. Subsequently, a printed copy of the NCIC report was obtained. *Id.* at 569, 680 S.E.2d at 366.

The Virginia Court of Appeals held that even though a person with personal knowledge of the facts input into the NCIC database had not testified, admission of the NCIC report under the business records hearsay exception was proper because " 'evidence show[ed] the regularity of the preparation of the records and reliance on them by their preparers or those for whom they are prepared.' " *Id.* at 568, 680 S.E.2d at 366 (quoting *Frye v. Commonwealth*, 231 Va. 370, 387, 345 S.E.2d 267, 279-80 (1986) (upholding admission of NCIC report identifying defendant as escapee)).

Detective Rhodes' testimony was materially indistinguishable from that found sufficient in *Cooper*. While *Cooper* is not controlling, we believe that it and *Frye* are persuasive authority for the trial court's admission of Detective Rhodes' testimony that the NCIC database reported defendant's gun as having been stolen in South Miami, Florida. The rationale in *Cooper* and *Frye* dovetails with this Court's reasoning in *Windley*. Therefore, we hold that the admission of Detective Rhodes' testimony regarding the NCIC report was not plain error.[2]

II

We need not address the admissibility of the content of the police report from the South Miami Police Department or the admissibility

---

2. Defendant does not argue that the evidence was inadmissible under Rule 803(8), and we therefore express no opinion on that question. *See State v. Forte*, 360 N.C. 427, 436, 629 S.E.2d 137, 144 ("[W]e must determine whether these reports are admissible under Rule 803(8) before we can decide whether they are admissible as business records."), *cert. denied*, 549 U.S. 1021, 166 L. Ed. 2d 413, 127 S. Ct. 557 (2006).

of statements made by a detective with the South Miami Police Department. Even assuming, without deciding, that the trial court should have excluded that evidence, defendant has failed to demonstrate sufficient prejudice in light of the properly-admitted NCIC information and defendant's own testimony. "The plain error rule applies only in truly exceptional cases. Before deciding that an error by the trial court amounts to 'plain error,' the appellate court must be convinced that absent the error the jury probably would have reached a different verdict." *State v. Walker*, 316 N.C. 33, 39, 340 S.E.2d 80, 83 (1986).

On the issue of prejudice, defendant asserts that the only evidence the gun was stolen came from the improperly admitted hearsay evidence. He then argues:

> [I]f the trial court had ruled correctly on these evidentiary issues and had excluded the out-of-court statements in question — i.e., (a) the statements in the printout from the database of the National Crime Information Center, (b) the statements in the initial police report from the City of South Miami, Florida[] Police Department, and (c) the over-the-phone statements by Detective Lopez with that Florida police department —, [sic] then the jury might very well have reached a different verdict in regard to the possession of stolen property charge. In short, the trial court committed *plain error* in admitting these inadmissible hearsay statements.

The standard is not, however, whether "the jury might very well have reached a different verdict in regard to the possession of stolen property charge." For plain error, a defendant must demonstrate that the jury would probably have reached a different verdict on the possession of stolen goods charge in the absence of each piece of evidence. *Id.*

More particularly, given defendant's argument, the question is whether the evidence was such that the jury would probably conclude that the gun possessed by defendant was stolen in the absence of the police report and the telephone conversation with the Florida detective. Detective Rhodes testified regarding the serial number of the gun possessed by defendant. He explained how the NCIC database catalogues the serial numbers of guns and other pieces of property that have been reported stolen. In testimony that we have already held was admissible, Detective Rhodes told the jury that two separate searches of the NCIC database had indicated that a gun with

S.T. WOOTEN CORP. v. BD. OF ADJUST. OF TOWN OF ZEBULON

[210 N.C. App. 633 (2011)]

the same serial number as the gun possessed by defendant was reported stolen in South Miami, Florida.

In addition, defendant himself testified about how he obtained the handgun. He admitted that he purchased the gun in Miami in March 2008 on a street corner from someone he did not know. He claimed that he believed the seller's statement that the gun was not stolen even though he was purchasing the gun for only $100.00. On redirect examination, defendant was asked, "And you don't know whose gun it is, do you?" He responded, "No, sir." Additionally, defendant did not register the gun in either Florida or North Carolina.

The jury, therefore, had before it evidence that the NCIC database reported the gun as stolen in South Miami, that defendant admitted that he bought the gun on a Miami street corner from a stranger for $100.00, that he admitted not knowing who actually owned the gun, and that he did not register the gun. In light of this evidence, we do not believe that the jury would probably have found defendant not guilty of possession of stolen property (the gun) had the trial court excluded the Florida police report and the telephone conversation with the Florida detective.

No error.

Judges McGEE and CALABRIA concur.